UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAY SCHUYLEMAN,                          CASE NO. C23-0562JLR

                          Plaintiff,     ORDER

          v.

BARNHART CRANE AND
RIGGING CO., et al.,

                          Defendants.

## I.    INTRODUCTION

Before the court are the parties' dueling *Daubert* motions to exclude evidence and testimony.  Defendants Barnhart Crane and Rigging Co. and Barnhart Crane and Rigging LLC (collectively, "Barnhart") move the court to (i) exclude the testimony and report of Richard W. Klopp, Ph.D. (Klopp Mot. (Dkt. # 92); Klopp Reply (Dkt. # 106)); (ii) strike portions of Dr. Klopp's report (Klopp MTS (Dkt. # 86); Klopp MTS Reply (Dkt. # 89)); and (iii) exclude the testimony of Lance Morman (Morman Mot. (Dkt. # 91); Morman

Reply (Dkt. # 105)).  Plaintiff Jay Schuyleman asks the court to exclude the testimony of

Gregg S. Perkin (Perkin Mot. (Dkt. # 93); Perkin Reply (Dkt. # 108)).  All of the motions

are opposed.  (Klopp Resp. (Dkt. # 101); Klopp MTS Resp. (Dkt. # 97); Morman Resp.

(Dkt. # 103); Perkin Resp. (Dkt. # 100).)  The court has considered the parties' *Daubert*

motions, the relevant portions of the record, and the applicable law.  Being fully advised,[1]

the court DENIES Barnhart's motion to exclude Dr. Klopp's report and testimony,

GRANTS in part and DENIES in part Barnhart's motion to strike Dr. Klopp's report,

GRANTS Barnhart's motion to exclude Mr. Morman's report, and GRANTS in part and

DENIES in part Mr. Schuyleman's motion to exclude Mr. Perkin's testimony.

## II.    BACKGROUND

Before examining the parties' respective motions, the court briefly details the

factual and procedural background of this case.

**A.    Factual Background**

This is a patent infringement case.  Mr. Schuyleman alleges that Barnhart infringes

the claims of United States Patent No. 8,317,244 (the "'244 Patent").  (*See* Third Am.

Compl. (Dkt. # 42), Ex. 1.)[2]  The '244 Patent, entitled "Apparatus and Method for

Positioning an Object in a Building," is directed to "an improvement for an offset

---

[1] The parties do not request oral argument, and the court concludes that oral argument is not necessary to dispose of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[2] At the outset of this case, Mr. Schuyleman asserted claims 1, 2, 4, 12, 13, 16, and 17 against Barnhart. (*See* MTS, Ex. 4 ("Infringement Contentions").)  However, in conjunction with service of Dr. Klopp's report, Mr. Schuyleman informed Barnhart that claims 1, 4, 16, and 17 are "the claims [he] is pursuing at this time." (*See* 10/19/24 Email (Dkt. # 94-4) at 2; *see* Klopp Report at 12-15 (noting that only claims 1, 4, 16, and 17 are asserted).)

1    hoisting apparatus for use with a crane to lift a load." (*Id.* at col. 2:13-14.)  The '244

2    Patent purports to facilitate the safe depositing of a load, such as a wall panel or crate,

3    into an opening in a building during construction.  (*See generally id.*)  Hanging a load

4    from a crane hook in front of an opening in a building is dangerous because workers must

5    approach a ledge and reach out to pull the load inside the building.  (*See id.* at col.

6    1:35 44.)  The '244 Patent purports to resolve this problem through use of an "offset

7    hoisting apparatus" with a beam—or "rigid boom"—capable of being "selectively slid

8    between a refracted position and an extended position." (*Id.* at col. 4:40-41.)  The beam

9    travels along the x-axis by sliding through mounts attached to the offset hoisting

10    apparatus.  (*Id.* at col. 3:43-53.)  Once the beam slides into the appropriate position, the

11    load is secured to the hook at the end of the beam.  (*See id.* at col. 4:40-43.)  A crane can

12    then lift the offset hoisting apparatus and deposit the load several feet inside of an

13    opening, obviating the need for workers to pull the load into the building.  (*See id*. fig. 1.)

14        Mr. Schuyleman alleges that Barnhart infringes the claims of the '244 Patent "by

15    making, using, selling, offering to sell, and importing into the United States, certain

16    equipment with a moveable boom" including three of Barnhart's products:  (1) the

17    Moveable Counterweight Cantilever System ("MOCCS") (e.g., Standard Movable

18    Counterweight Cantilever System and Movable Counterweight Double Beam); (2) the

19    Mini-MOCCS; and (3) the Mega-MOCCS (collectively, the "Accused Products").  (Third

20    Am. Compl. ¶ 6.)

21

22

**B.    Procedural Background**

Mr. Schuyleman timely served his Infringement Contentions.  (*See* Infringement Contentions; 2/6/24 Order (Dkt. # 47) (setting 3/22/24 deadline for service of preliminary infringement contentions).)  Barnhart timely served its invalidity and non-infringement contentions.  (*See generally* Contention Amend. Motion (Dkt. # 76); 4/25/24 Order (Dkt. # 53) (setting 4/12/24 deadline for service of non-infringement and invalidity contentions).)  On July 31, 2024, the parties filed a joint claim construction statement, and the parties completed their respective claim construction briefing in August 2024.  (Joint Stmt. (Dkt. # 61); CC Briefing (Dkt. ## 62-65).)  The court held a *Markman* claim construction hearing on October 4, 2024, and issued its claim construction order on October 9, 2024.  (10/4/24 Min. Entry (Dkt. # 72); CC Order (Dkt. # 73).)

The parties exchanged opening expert reports on November 15, 2024, and rebuttal reports on December 13, 2024.  (*See* 7/17/24 Order (Dkt. # 60) (setting expert disclosure deadline for 11/15/24).)  The discovery deadline expired on January 3, 2025.  (*See* 7/17/24 Order.)  At the parties' request, the court extended the parties' deadline to take expert depositions to January 24, 2025.  (11/5/2024 Order (Dkt. # 78).)  The parties timely filed cross motions for summary judgment.  (*See* Barnhart MSJ (Dkt. # 94); Schuyleman MSJ (Dkt. # 95); *see* 7/17/24 Order (setting dispositive motions deadline for 2/11/25).)  The court has not yet ruled on the parties' motions for summary judgment.[3]

---

[3] The parties' summary judgment motions will be addressed in a separate order.

1    This order addresses the parties' *Daubert* motions.  The motions are fully briefed and ripe

2    for ruling.

3                                    III.    ANALYSIS

4        The court first discusses the legal standards governing *Daubert* motions, and then

5    considers the parties' motions in turn.

6    **A.    Legal Standards Governing *Daubert* Motions**

7        Federal Rule of Evidence 702 tasks the district court with "ensuring that an

8    expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

9    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Daubert v.*

10   *Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1313 (9th Cir. 1995).  An expert's

11   testimony is admissible under Rule 702 if:  (1) the witness is sufficiently qualified as an

12   expert by knowledge, skill, experience, training, or education; (2) the scientific, technical,

13   or other specialized knowledge will help the trier of fact to understand the evidence or to

14   determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the

15   testimony is the product of reliable principles and methods; and (5) the expert has reliably

16   applied the relevant principles and methods to the facts of the case.  Fed. R. Evid.

17   702(a)-(d).  The relevance inquiry considers whether "the knowledge underlying [the

18   expert testimony] has a valid connection to the pertinent inquiry" in the case.  *Alaska*

19   *Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  Expert

20   testimony is relevant if it "assist[s] the trier of fact" in determining a fact at issue.

21   *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

22

1    In evaluating proffered expert testimony, the court acts as "a gatekeeper, not a fact

2  finder." *Id.* at 568.  The role of the court is not to "decid[e] whether the expert is right or

3  wrong, just whether [the] testimony has substance such that it would be helpful to a jury."

4  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting

5  *Alaska Rent-A-Car*, 738 F.3d at 969-70).  Accordingly, "[c]hallenges that go to the

6  weight of the evidence are within the province of" the jury—not the court.  *Id.*; *see also*

7  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (noting that if the

8  proposed expert testimony is both reliable and relevant, "its proponent is entitled to have

9  the jury decide upon [its] credibility, rather than the judge" (citation omitted)).  In

10  evaluating the reliability of expert testimony, the court's inquiry focuses "not on the

11  correctness of the expert's conclusions but on the soundness of his methodology."

12  *Daubert II*, 43 F.3d at 1318.  The party offering the disputed expert testimony has the

13  burden of establishing its admissibility.  *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg.*

14  *Code Council,* 683 F.3d 1144, 1154 (9th Cir. 2012).  Because this is a patent case, the

15  court applies "regional circuit law to procedural issues and Federal Circuit law to

16  substantive and procedural issues pertaining to patent law."  *Whitserve, LLC v. Comput.*

17  *Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012).  The court assesses the parties'

18  respective motions with these principles in mind.

19  **B.    Barnhart's Motion to Exclude Dr. Klopp's Report and Testimony**

20    Mr. Schuyleman retained Dr. Klopp to opine on Barnhart's alleged infringement

21  of the '244 Patent.  (*See* Klopp Report (Dkt. # 92-2) at 1.)  Barnhart argues that Dr.

22  Klopp's report and testimony should be excluded because (1) he is not a person of

1    ordinary skill in the art ("POSITA"); and (2) his opinions are based on unreliable

2    evidence.  (*See* Klopp Mot. at 6, *id.* at 7-17.)  The court addresses these arguments below.

3        1.  <u>Dr. Klopp Qualifies as a POSITA</u>

4        Patent claims are analyzed from the perspective of one of ordinary skill in the art.

5    *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008).

6    Accordingly, to offer expert testimony on issues of patent infringement or validity, "a

7    witness must have at least ordinary skill in the art."  *Kyocera Senco Indus. Tools Inc. v.*

8    *Int'l Trade Comm'n*, 22 F.4th 1369, 1376 (Fed. Cir. 2022).  "Without such skill, the

9    witness' opinions . . . would not be based on any specialized knowledge, training, or

10   experience that would be helpful to the factfinder."  *Id.*  During the claim construction

11   phase of this case, the court defined a POSITA as:

12
13         someone with a Bachelor's degree in mechanical engineering, structural
     engineering, applied physics, or a related field with at least four years of
     engineering experience analyzing, designing, or developing construction
     equipment for rigging or crane-related devices.

14
15   (10/2/24 Order (Dkt. # 71).)  The parties dispute whether Dr. Klopp qualifies as a

16   POSITA.  (*See* Klopp Mot. at 7, 11; Klopp Resp. at 2, 4.)  Barnhart argues that Dr. Klopp

17   lacks the precise technical expertise required by the court's POSITA definition—namely,

18   "at least four years of engineering experience analyzing, designing, or developing

19   construction equipment for rigging or crane-related devices."  (Klopp Mot. at 11; 10/2/24

20   Order.)  Mr. Schuyleman counters that Dr. Klopp is qualified to testify because he has

21
22

ORDER - 7

1    experience "in the mechanical arts" and has the requisite background to satisfy the

2    court's POSITA standard.[4]  (*See* Klopp Resp. at 4.)

3        Dr. Klopp holds a Bachelor's degree in mechanical engineering and a Ph.D. in

4    engineering.  (Klopp Mot., Ex. 2 at 15-20.)  He has been employed as a Principal

5    Engineer at Exponent, Inc. for 24 years.  (*Id.*)  His experience includes "engineering and

6    application of stationary and mobile hoisting apparatuses used in construction,

7    manufacturing, mining, machinery repair, and structural testing."  (*Id.*)  For

8    approximately two years, Dr. Klopp worked at least part-time assessing and

9    recommending modifications to the cableways[5] used to construct the Mike O'Callaghan-

10   Pat Tillman Memorial Bridge ("Hoover Dam Bypass Project").  (Klopp Report, App'x A

11   at 7 ("Klopp CV"); *see* 1st Dep. of R. Klopp (Dkt. # 92-4) ("Klopp 1st Dep.") at 27:2-25;

12   *see* 2d Dep. of R. Klopp (Dkt. # 92-5) ("Klopp 2d Dep.") at 37:4-13, 39:4-13.)  He also

13   has experience evaluating the "hoisting gearing of a crane used as a clam shell dredge."

14   (Klopp 1st Dep. at 28:2-20.)  As part of a large project to remove a tunneling machine

15   from a mine, Dr. Klopp and his team performed a structural analysis related to the

16   attachment point for one of the lifts used in the project.  (*Id.* at 31:8-21, 33:5-34:1.)  Dr.

17   Klopp also played a role in assessing the structural integrity of a crane that was exposed

18   to a fire—including "an analysis of the materials and designs" of the crane, although he

19

20    _____

        [4] In the alternative, Mr. Schuyleman argues that Dr. Klopp need not qualify as a POSITA
21   to testify as an expert.  (Klopp Resp. at 3.)  Because the court concludes that Dr. Klopp is a
     POSITA, the court need not resolve that dispute here.

22        [5] Dr. Klopp stated that "cableways are a kind of crane."  (Klopp 2d Dep. at 50:23-24.)

1   did not complete a "full-on . . . structural review" of the crane in that project.  (*Id.* at

2   34:2-22, 35:10-21; Klopp 2d Dep. at 45:14-18.)  Beginning in 2012 and on and off for "a

3   couple of years" afterwards, Dr. Klopp also assessed the cause of failed machinery at an

4   iron ore concentrator facility.  (Klopp 2d Dep. at 47:8-25.)

5          Barnhart asserts that the aforementioned experiences do not sufficiently qualify as

6   work "analyzing, designing, or developing" rigging or crane-related devices—let alone

7   *four years'* worth of experience.  (Klopp Mot. at 7-11; Klopp Reply at 6-7.)  Even

8   assuming that is true, Dr. Klopp provided several additional examples of his rigging and

9   crane-related work experience, including analyzing and testing a pivot structure of a

10  crawler crane, conducting failure analyses of a tower crane and the axle of an all-terrain

11  boom lift, and analyzing and testing the failure resistance of lift braking mechanisms, to

12  name a few.  (*See, e.g.*, Klopp Decl. (Dkt. # 101-1) ¶¶ 17(a), (d), (i), (j).)[6]  In viewing

13  these experiences collectively with the experiences listed on Dr. Klopp's curriculum

14  vitae, the court is confident that Dr. Klopp has at least four years' worth of experience

15  analyzing, designing, or developing rigging or crane-related devices.  Accordingly, the

16  court concludes that Dr. Klopp qualifies as a POSITA and may offer expert testimony

17  about infringement.

18

19

_____

20      [6] Barnhart contends that these latter examples should not be considered in determining
    Dr. Klopp's qualifications to testify as an expert because they were not timely disclosed pursuant
21  to Rule 26(a)(2).  Barnhart accordingly moves to strike Dr. Klopp's Declaration.  (Klopp Reply
    at 6.)  Barnhart does not explain, however, why disclosure of Dr. Klopp's additional
    qualifications at this stage is harmful.  (*See generally* Klopp Reply.)  Accordingly, the court
22  denies Barnhart's request to strike Dr. Klopp's Declaration.

1    2. <u>Dr. Klopp's Methodology is Reliable</u>

2    Barnhart also asserts that Dr. Klopp's testimony should be excluded because

3  portions of his report refer to images from Barnhart's marketing materials.  (*See* Klopp

4  Mot. at 13-17.)  Barnhart challenges these images on two separate bases.

5    First, Barnhart challenges Dr. Klopp's use of images from Barnhart's marketing

6  materials purportedly depicting the Mini-MOCCS and the Mega-MOCCS.[7]  (Klopp Mot.

7  at 16; *see id.* n.1, n.2.)  Mr. Schuyleman contends that Dr. Klopp's use of the images is

8  appropriate because his opinions are derived from a variety of sources in addition to the

9  images and videos.  (*See* Klopp Resp. at 3-4.)

10    The court agrees with Mr. Schuyleman.  Barnhart's argument for exclusion

11  appears to depend on Barnhart's belief that Dr. Klopp's opinions rely entirely on the

12  marketing materials.  (*See* Klopp Reply at 7 ("[Dr.] Klopp's opinion that limitation 1[c]

13  of claim 1 . . . is met by the Accused Products . . . relies <u>exclusively on inaccurate</u>

14  <u>cartoons and not the Accused Product</u>.") (emphasis in original).)  Although

15  "advertisements alone are generally insufficient evidence of infringement[,]" *Pellegrini v.*

16  *Analog Devices, Inc.*, No. Civ.A. 02-11562RWZ, 2006 WL 83472, at *3 (D. Mass. Jan.

17  11, 2006), *aff'd*, 312 F. App'x 304 (Fed. Cir. 2008), Dr. Klopp represents that his

18

19  [7] Barnhart also takes issue with the fact that Dr. Klopp did not "produce a Barnhart representative to validate or explain" the advertising videos.  (Klopp Mot. at 16; *see also* Klopp Reply at 7 (arguing that Barnhart failed to authenticate the advertising materials).)  Federal Rule
20  of Evidence 703, however, explicitly permits an expert to rely on evidence or data that the expert has not personally observed.  *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert *has been made aware of or* personally observed.") (emphasis
21  added).  Although Dr. Klopp cannot testify regarding the truth of the matters asserted in the materials, he can refer to them in explaining his opinions.
22

1    opinions are based on the specification sheets, operating procedures, and other materials

2    related to the Mini-MOCCS and Mega-MOCCS, *in addition to* the marketing materials.

3    (Klopp Report at 11; *id.* at App'x C (listing materials Dr. Klopp "considered and/or relied

4    on when authoring this report and the [] Claims Charts" attached to his report at

5    Appendix D).)  To the extent that Barnhart argues that Dr. Klopp may not rely on

6    materials from Barnhart's website as a general matter, the court is not persuaded.  *See*

7    *Glaukos Corp. v. Invantis, Inc.*, No. SACV-18-620 JVS (JDEx), 2020 WL 10501851, at

8    *11-*12 (C.D. Cal. July 23, 2020) (concluding that expert's reliance on alleged

9    infringer's marketing materials did not warrant exclusion because expert "may testify as

10   to his understanding of [alleged infringer's] informational materials and how . . . he

11   would understand the [infringing product] to work based on [those] materials").

12        Second, Barnhart challenges certain website images of the Mini-MOCCS and

13   Mega-MOCCS that Dr. Klopp purportedly modified to illustrate that configurations of

14   these products satisfy the claim limitations "front mount," "front boom aperture," "rear

15   mount," and "rear boom aperture."  (Klopp Mot. at 13-14.)  Barnhart asserts that these

16   images are not reliable because Dr. Klopp did not refer to materials showing any

17   "*interior* components" of these products in his report.  (*Id.*)  Barnhart further asserts that

18   these images do not accurately represent the interior components of these products.  (*Id.*

19   at 14-15 (citing Kaercher Decl. (Dkt. # 92-1) ¶ 14).)  The court declines to exclude Dr.

20   Klopp's testimony on this basis.  Dr. Klopp may testify about how the Accused Products

21   work based on Barnhart's materials.  *Glaukos Corp*, 2020 WL 10501851, at *11-*12.

22   Furthermore, the court has not found any authority providing that an expert cannot

ORDER - 11

1    prepare illustrations or annotate a diagram to support his opinions.  Indeed, several

2    decisions have held to the contrary.  *See Icon-IP Pty Ltd. v. Specialized Bicycle*

3    *Components, Inc.*, 87 F. Supp. 3d 928, 950-51 (N.D. Cal. 2015) (expert's testimony

4    permitted where expert provided illustrations supporting his opinion that the accused

5    products did not satisfy claim limitations); *Power Integrations, Inc. v. ON Semiconductor*

6    *Corp.*, 396 F. Supp. 3d 851, 889 (N.D. Cal. 2016) (taking no issue with expert's

7    annotations of circuit schematics to support his opinion).  The "correctness" of Dr.

8    Klopp's conclusions go to the weight of the evidence.  *See Daubert II*, 43 F.3d at 1318;

9    *see also Elosu*, 26 F.4th at 1024 ("[S]haky but admissible evidence is to be attacked by

10   cross examination . . . not exclusion."); *cf. Nat'l Prods., Inc. v. Arkon Resources, Inc.*,

11   No. CV 18-02936 AG (SSx), 2019 WL 1034321, at *7-*8 (C.D. Cal. Jan. 9, 2019)

12   (defendant's challenges to plaintiff's conclusions supported by expert's annotated image

13   were questions of fact).[8]

14        Accordingly, the court finds Dr. Klopp's opinions sufficiently reliable and denies

15   Barnhart's motion to exclude his report and testimony.

16

17

18   _____

19       [8] Barnhart also challenges Dr. Klopp's opinions because he did not see the Accused
     Products in person and because his associate created the diagrams purporting to show the cross-
     sections.  (Klopp MTS at 15.)  These challenges, however, go to the weight of the evidence and

20   are better suited for cross examination.  *Cf. J.R. Simplot Co. v. McCain Foods USA, Inc.*, 713 F.
     Supp. 3d 904, 974 (D. Idaho 2024) ("The degree to which [expert] was involved in the

21   preparation . . . may be relevant to how much weight [his] testimony should be given, but those
     factors alone do not warrant exclusion."); *see also* Fed. R. Evid. 703 (permitting experts to

22   render opinions on "facts or data in the case that the expert has been made aware of or personally
     observed").

1    **C.    Barnhart's Motion to Strike Portions of Dr. Klopp's Report**

2        Barnhart also seeks to strike the following portions of Dr. Klopp's report:  (i) his

3    discussion of the doctrine of equivalents theory; (ii) his reliance on technical images;

4    (iii) his theories relating to the "improvements" to the offset hoisting apparatus; and

5    (iv) his identification of new allegedly infringing structures on the Accused Products.

6    (Klopp MTS at 2.)  Barnhart contends that these constitute new theories that were not

7    disclosed in Mr. Schuyleman's Infringement Contentions.  (*See id.*)  The court first

8    discusses the relevant legal standard, and then addresses Barnhart's arguments.

9        1.  Legal Standard Governing Infringement Contentions

10        Infringement contentions "require parties to crystallize their theories of the case

11    early in the litigation and to adhere to those theories once they have been disclosed."

12    *REC Software USA, Inc. v. Bamboo Sols. Corp.*, No. C11-0554JLR, 2012 WL 3527891,

13    at *2 (W.D. Wash. Aug. 15, 2012).  Under this District's Local Patent Rules, a patentee's

14    infringement contentions must "identify[] specifically where each element of each

15    Asserted Claim is found within each Accused [Product]."  Local Patent Rules W.D.

16    Wash. LPR 120(c).  "The patentee's infringement contentions [] must be specific enough

17    to provide reasonable notice to the defendant why the plaintiff believes it has a

18    reasonable chance of proving infringement."  *Utherverse Gaming LLC v. Epic Gaming,*

19    *Inc.*, No. C22-0799RSM-TLF, 2023 WL 4908304, at *5 (W.D. Wash. July 10, 2023)

20    (internal quotation and citations omitted).  Infringement contentions, however, "do not

21    need to include direct proof or direct evidence of infringement."  *AntiCancer, Inc. v.*

22    *Pfizer, Inc.,* 769 F.3d 1323, 1338 (Fed. Cir. 2014).

1    Expert reports may not introduce new infringement theories that are not set forth

2    in the party's contentions. *Apple Inc. v. Samsung Elec. Co., Ltd.*, No. 5:12-cv-0630-

3    LHK-PSG, 2014 WL 12917334, at *1 (N.D. Cal. Jan. 9, 2014).[9]  "The scope of

4    contentions and expert reports, are not, however, coextensive." *Id.* (internal quotation

5    and citation omitted).  In fact, "[i]n patent litigation, expert reports are expected to

6    provide more information than is contained in infringement contentions." *Digital Reg. of*

7    *Texas, LLC v. Adobe Sys. Inc.*, No. CV 12-01971-CW (KAW), 2014 WL 1653131, at *5

8    (N.D. Cal. Apr. 24, 2014).  "The threshold question" is "whether the expert has

9    permissibly specified the application of a disclosed theory or impermissibly substituted a

10   new theory altogether." *Id.*

11        2.  The Doctrine of Equivalents Theory

12        Barnhart argues that Dr. Klopp's report advances an "entirely new theory" of

13   infringement under the doctrine of equivalents ("DOE") "relating to Claim[] [1]

14   (limitation 1.c)" of the MOCCS.[10]  (Klopp MTS at 5-6; Klopp MTS Reply at 2; *see also*

15   Klopp MTS at 6 (citing Klopp Report, App'x D at 33-34, 36, 39, 41 (advancing DOE

16   arguments relating to the MOCCS product)).)  Barnhart contends that Mr. Schuyleman's

17

18        [9] As this court previously noted, the Northern District of California's local patent rules
     closely track that of the Western District of Washington. *See, e.g.*, *REC Software*, 2012 WL

19   3527891, at *5.  The court accordingly finds caselaw from the Northern District of California
     helpful in deciding these contentions issues.

20
          [10] In its motion to strike, Barnhart appears to seek to strike Dr. Klopp's DOE arguments

21   relating to independent claim 1 and dependent claims 2, 12-13, and 16-17.  (*See* Klopp MTS at
     6.)  Barnhart, however, abandoned its argument with respect to claims 2, 12-13, and 16-17 in its
     reply, and the court accordingly does not address those arguments here. *See McCarthy v.*

22   *Amazon.com, Inc.*, No. C23-0263JLR, 2023 WL 5509258 n.5 (W.D. Wash. Aug. 25, 2013).

1    Infringement Contentions include only a "boilerplate reservation of rights" under the

2    DOE and therefore do not adequately disclose this new theory with respect to the

3    MOCCS.  (*See* Klopp MTS at 5-6.)  Barnhart requests that this new DOE theory be

4    stricken from Dr. Klopp's report.  (*See* Klopp MTS Reply at 2.)  Mr. Schuyleman admits

5    that Dr. Klopp's report alleges a new DOE theory of infringement with respect to the

6    MOCCS product, but seeks leave to amend its contentions because the new theory

7    "impacts only a single limitation" related to the MOCCS.  (Klopp MTS Resp. at 9.)

8           The Local Patent Rules require a plaintiff's infringement contentions to state

9    "[w]hether each element of each asserted claim is claimed to be literally present and/or

10   present under the doctrine of equivalents in the Accused Device[.]"  Local Patent Rules

11   W.D. Wash. LPR 120(e).  These requirements serve a notice function.  *See Phigenix, Inc.*

12   *v. Genentech, Inc.*, 783 F. App'x 1014, 1018 (Fed. Cir. 2019) (considering the Northern

13   District of California's local patent rules).  Indeed, they "bolster discovery" under the

14   Federal Rules because they "'allow the defendant to pin down the plaintiff's theories of

15   liability . . . thus confining discovery and trial preparation to information that is pertinent

16   to the theories of the case.'"  *Id.* (citation omitted).  Consequently, a boilerplate statement

17   regarding the DOE in infringement contentions is insufficient to preserve a DOE

18   argument.  *OptimumPath, LLC v. Belkin Int'l, Inc.*, No. 09-CV-01398 CW, 2011 WL

19   1399257, at *8 (N.D. Cal. Apr. 12, 2011), *aff'd*, 466 F. App'x 904 (Fed. Cir.

20   2012) (noting that "judges of this court have rejected plaintiffs' attempts to assert claims

21   under the doctrine of equivalents with blanket statements").  Mr. Schuyleman does not

22

1  dispute that his contentions alleged only boilerplate DOE theories.  (*See generally* Klopp

2  MTS Resp.)

3       A party seeking to amend its contentions must demonstrate good cause.  *See REC*

4  *Software*, 2012 WL 3545056, at *6; *see also* Local Patent Rules W.D. Wash. LPR 124

5  (permitting amendments to infringement contentions "only by order of the Court upon a

6  timely showing of good cause").  The good cause inquiry considers first whether the

7  moving party was diligent in amending its contentions and then whether the non-moving

8  party would suffer prejudice if the motion to amend were granted.  *AG Acquisition, LLC*

9  *v. Flying Crocodile, Inc.*, No. C19-1278BJR, 2021 WL 2778578, at *4 (W.D. Wash. July

10  2, 2021).

11       The party seeking to amend its contentions bears the burden of establishing

12  diligence.  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366-67

13  (Fed. Cir. 2006).  Here, Mr. Schuyleman's briefing is devoid of any analysis showing

14  diligence.  (Klopp MTS Resp. at 9; *see generally id.* at 9-10.)  And the court cannot

15  conclude from the record that Mr. Schuyleman diligently sought to amend his

16  Infringement Contentions.  On October 16, 2024—one week after the court issued its

17  claim construction order—Barnhart notified Mr. Schuyleman's counsel that Barnhart

18  intended to amend its contentions and asked whether Mr. Schuyleman would seek to

19  amend his Infringement Contentions.  (*See* MTS, Ex. 7.)  On October 17, 2024, Mr.

20  Schuyleman's counsel represented that Mr. Schuyleman did not intend to amend his

21  Infringement Contentions.  (*See id.*)  On October 22, 2024, Barnhart sought leave to

22

1    amend its non-infringement and invalidity contentions, which the court granted on

2    November 26, 2024.  (Amend. Cont. Mot. (Dkt # 76); Amend. Cont. Order (Dkt. # 81).)

3          On November 15, 2024, Mr. Schuyleman served Dr. Klopp's report containing the

4    new DOE argument.  (*See* MTS, Ex. 9 at 2-3 (11/15/24 email serving Dr. Klopp's

5    opening expert report).)  On November 19, 2024—four days after receiving Dr. Klopp's

6    report—Barnhart's counsel notified Mr. Schuyleman's counsel that the "boilerplate

7    [DOE] reservations are inadequate under the Local Patent Rules to provide Barnhart

8    notice of the extent of Mr. Schuyleman's contentions" and requested that the DOE

9    theories be removed from Dr. Klopp's report.  (MTS, Ex. 8 at 4.)  On November 26,

10   2024, Mr. Schuyleman's counsel responded that Dr. Klopp's report did not assert new

11   theories and that Mr. Schuyleman "will not be voluntarily removing any aspect of Dr.

12   Klopp's report."  (*Id.*, Ex. 9.)  By including the new DOE theory in Dr. Klopp's expert

13   report, Mr. Schuyleman, in effect, "attempted to amend [his] prior disclosures without

14   formally asking to do so."  *Corus Realty Holdings, Inc. v. Zillow Grp., Inc.*, No. C18-

15   0847JLR, 2020 WL 488545, at *8 (W.D. Wash. Jan. 30, 2020), *aff'd*, 860 F. App'x 728

16   (Fed. Cir. 2021).  "This was not an effort in diligence but rather in subversion of the

17   Local Patent Rules."  *Id.*

18         Because Mr. Schuyleman has not demonstrated diligence, the court is not required

19   to consider whether his untimely disclosure prejudiced Barnhart.  *See Corus Realty*

20   *Holdings*, 2020 WL 488545, at *8; *Hemopet v. Hill's Pet Nutrition, Inc.*, No. SACV

21   12-1908-JLS (JPRx), 2014 WL 12603093, at *3 (C.D. Cal. Sept. 3, 2014) ("The "good

22   cause" analysis ends with a determination that [plaintiff] was not diligent.")

1    Nevertheless, the court concludes that Barnhart would be prejudiced by permitting

2    amendment.  Mr. Schuyleman withheld the full scope of his DOE infringement theory for

3    a majority of the discovery period.  Although the discovery period closed on January 3,

4    2025 (*see* 7/17/24 Order), Mr. Schuyleman's untimely disclosure deprived Barnhart of

5    any realistic ability to conduct discovery on the new DOE theory.  Indeed, had Barnhart

6    wanted to serve written discovery on these theories, it would have needed to formulate

7    and serve those requests at least 30 days prior to the discovery cutoff.  *See* Fed. R. Civ. P.

8    33(b)(2); Fed. R. Civ. P. 34(b)(2)(A).  Barnhart therefore would have needed to serve

9    those requests on Mr. Schuyleman by December 4, 2024—nine days before its rebuttal

10   report was due.  (*See* 7/17/24 Order.)

11         Mr. Schuyleman contends that Barnhart would not be prejudiced because it had an

12   opportunity to depose Mr. Schuyleman (as the corporate designee for Flying Forklift,

13   LLC) in December 2024, and Dr. Klopp in January 2025.  (Klopp MTS Resp. at 9-10.)

14   These facts do not change the court's analysis.  As explained above, Barnhart

15   communicated to Mr. Schuyleman by no later than November 19, 2024, its belief that his

16   Infringement Contentions failed to provide notice of his DOE theories.  Mr. Schuyleman

17   was therefore "on notice of the deficiency" and failed to amend his contentions "at his

18   own risk."  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL

19   3640694, at *5 (N.D. Cal. June 11, 2015).  Accordingly, the court will not permit Mr.

20   Schuyleman to amend his Infringement Contentions to include his DOE theory at this

21   stage.

22

1          3.  Dr. Klopp's Use of Technical Images

2          Barnhart also faults Dr. Klopp's report for "accus[ing] actual products for the first

3   time." (Klopp MTS at 6 (capitalization omitted).)  Specifically, Barnhart argues that Dr.

4   Klopp's report improperly "map[s] claim limitations onto an *actual* product" in technical

5   images of the Accused Products, whereas Mr. Schuyleman's Infringement Contentions

6   "accus[ed] only digital renderings of the Accused Products," even though Mr.

7   Schuyleman had access to the technical images before serving his Infringement

8   Contentions.  (*Id.* at 6-7 (citing S. Douglass Decl. (Dkt. # 86-5) ¶¶ 7-8, 11-12) (emphasis

9   in original).)  Barnhart asserts that Dr. Klopp's report should be stricken because, by

10  failing to amend his Infringement Contentions to include these technical images, Mr.

11  Schuyleman "deprived Barnhart of early notice of the *actual* features asserted to satisfy

12  the claim limitations[.]" (Klopp MTS at 9.)  The court is not persuaded by Barnhart's

13  argument.

14         The Local Patent Rules require a plaintiff's infringement contentions to include a

15  chart "identifying specifically where each element of each Asserted Claim is found

16  within each Accused Device." *See* Local Patent Rules W.D. Wash. LPR 120(c).  Expert

17  reports may "include information outside of the infringement contentions" so long as that

18  information does not "alter[] the disclosed theory of infringement." *See Dig. Reg. of*

19  *Texas*, 2014 WL 1653131, at *5.  Indeed, "[i]t is illogical to force a plaintiff to only be

20  able to use evidence in its expert reports that was originally in its infringement

21  contentions." *Sol IP, LLC, v. AT&T Mobility LLC*, No. 18-cv-526, 2020 WL 10045985,

22  at *2 (E.D. Tex. Apr. 23, 2020).  The court therefore cannot conclude that Dr. Klopp's

1    use of the technical images asserts new theories of infringement or that his report should

2    be stricken on this basis.

3        4.    Dr. Klopp's Opinions Regarding the "Improvement" to the "Offset Hoisting
              Apparatus"[11]

4

5    Barnhart also argues that Dr. Klopp's report advances a new theory regarding the

6    "improvement" to the offset hoisting apparatus.  (Klopp MTS at 9-11.)  Barnhart

7    contends that Mr. Schuyleman's Infringement Contentions allege that each of the

8    Accused Products meet the limitations of the preamble of claim 1 by "compris[ing] an

9    offset hoisting apparatus having at least a top side, a bottom side, a front side, and a rear

10   side, for use with a crane apparatus to lift a load."  (*Id.* at 10 (citing Infringement

11   Contentions, Ex. 1 at 1, Ex. 2 at 1, Ex. 3 at 1).)  In contrast, Barnhart asserts, Dr. Klopp's

12   report advances the new theory that the "improvement" has the claimed top, bottom,

13   front, and rear sides, "*rather than the* 'offset hoisting apparatus'" and identifies for the

14   first time the "locations of the side of the improvement."  (*Id.* at 9 (emphasis in original);

15   *id.* at 10 (cleaned up); *see* Reply at 3-4.)

16       Mr. Schuyleman responds that claim 1 is a "Jepson" claim[12] and therefore "the

17   claimed invention consists of the preamble in combination with the improvement."

18

19   [11] Per the court's request, the parties submitted supplemental briefing on this issue.  (*See* Barnhart Supp. Br. (Dkt. # 118); Schuyleman Supp. Br. (Dkt. # 119).)

20   [12] A "Jepson" claim contains three parts: "(1) a preamble comprising a general description of all the elements or steps of the claimed combination which are conventional or known, (2) a phrase such as 'wherein the improvement comprises,' and (3) those elements, steps and/or relationships which constitute that portion of the claimed combination which the applicant considers as the new or improved portion."  37 C.F.R. § 1.75(e); *see Rowe v. Dror,* 112 F.3d 473, 479 (Fed. Cir. 1997).

21

22

1    (Klopp MTS Resp. at 5 (citing *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315

2    (Fed. Cir. 1985)).  Mr. Schuyleman therefore asserts that whether Dr. Klopp's report

3    opines that the Accused Products infringe the '244 Patent via the "offset hoisting

4    apparatus or the improvement combined with the offset hoisting apparatus does not

5    introduce a 'new theory' of infringement."  (Klopp MTS Resp. at 5.)  In his supplemental

6    briefing, Mr. Schuyleman also appears to argue that he did not need to separately identify

7    the "improvement" to the offset hoisting apparatus in his infringement contentions

8    because "the preamble of claim 1 . . . does not require a specific variety of 'offset

9    hoisting apparatus.'"  (Schuyleman Supp. Br. at 3; *see id.* ("whether the 'offset hoisting

10    apparatus' of the preamble of claim 1 is the offset hoisting apparatus **by itself** or the offset

11    hoisting apparatus **as the claimed combination** should have no impact on the

12    infringement arguments in this case") (emphasis in original).)[13]  Barnhart argues that

13    under the Jepson format, the offset hoisting apparatus and the improvement are separate

14    claim limitations that therefore needed to be separately identified in Mr. Schuyleman's

15    Infringement Contentions.  (*See* Barnhart Supp. Br. at 3-4.)[14]

16

17    ───────────────

18        [13] In his supplemental briefing, Mr. Schuyleman represents that the court "refus[ed] to
construe the term "offset hoisting apparatus[.]"  (Schuyleman Supp. Br. at 3.)  The court clarifies
for the record that it did not "refuse[]" to construe "offset hoisting apparatus."  Rather, the court
19    "decline[d] to rule on" the parties' disputes regarding the alleged indefiniteness of the term
"offset hoisting apparatus" during the *Markman* hearing, but stated that it would consider that
20    dispute during the summary judgment stage should the parties choose to raise it.  (CC Order at 5;
Markman Hr'g Tr. (Dkt. # 75) at 5:5-6:1.)  The parties have briefed this issue in their respective
summary judgment motions and the court will address that dispute in a separate order.

21        [14] The court also clarifies for the record that it held that "*claim 1* is written in Jepson
22    format."  (5/6/25 Min. Order (Dkt. # 117) (emphasis added).)  Barnhart represents that "[t]he
parties agree that every claim in the '244 Patent is a Jepson claim."  (Barnhart Supp. Br. at 4.)

1    During the claim construction phase of this case, the court held—and the parties

2  agreed—that the preamble of claim 1 is limiting.  (*See* Markman Hr'g Tr. at 6:2-5,

3  6:13-19; *see also* CC Order at 5 (holding that the preamble of claim 1 is limiting).)  The

4  preamble is considered to be limiting "if the claim preamble, when read in the context of

5  the entire claim, recites limitations of the claim, or, if the claim preamble is necessary to

6  give life, meaning, and vitality to the claim."  *In re Xencor, Inc.*, 130 F.4th 1350, 1357

7  (Fed. Cir. 2025) (citation and internal quotations omitted).  Additionally, when the Jepson

8  format is used in a claim, the preamble of that claim functions as a "limitation because it

9  defines, in part, structural limitations of the claimed invention" described in the prior art.

10  *See Boston Sci. Corp. v. Micrus Corp.*, 556 F. Supp. 2d 1045, 1060 (N.D. Cal. 2008)

11  (citing *Epcon Gas Sys. Inc. v. Baur Compressors, Inc.*, 279 F.3d 1022, 1029 (Fed. Cir.

12  2002)).  Consequently, for purposes of patent infringement, "[t]he preamble in a Jepson

13  claim constitutes a limitation" that must be met by the accused device.  *See Dali*

14  *Wireless, Inc. v. Corning Optical Commc'ns LLC*, No. 20-CV-06469-EMC, 2021 WL

15  3037700, at *3 n.2 (N.D. Cal. July 19, 2021).[15]

16

17

18  For purposes of this order, the court offers no opinion as to whether any claims other than claim 1 are Jepson claims.

19    [15] In the context of deciding whether a Jepson claim preamble had sufficient written

20  description, the Federal Circuit affirmed that the preamble of a Jepson claim recites a distinct limitation:  "A patentee cannot be permitted to use a Jepson claim to avoid the requirement that []he be in possession of the claimed invention simply by asserting something is well-known in

21  the prior art.  For example, a patentee cannot obtain a Jepson claim with a preamble that says that a time machine is well-known in the art without describing a time machine[.]"  *Xencor*, 130

22  F.4th at 1362.

1  Mr. Schuyleman agrees that the "offset hoisting apparatus" is the "prior art" and

2 that the improvement that he claims in the '244 Patent is "different from an offset

3 hoisting apparatus." (*See* Schuyleman MSJ Resp. (Dkt. # 102) at 12 (citing Klopp Reb.

4 Report (Dkt. # 94-9) at 38 ("Thus, the prior art is an offset hoisting apparatus."); 11/8/24

5 Dep. of J. Schuyleman (Dkt. # 94-21) at 41:3-6 (not disputing that the "improvement [he]

6 claim[ed] in the patent is different from an offset hoisting apparatus"); *id.* at 40:6-20.)

7 The claim language attributes the top, bottom, front, and rear side claim elements to the

8 offset hoisting apparatus, rather than to the claimed improvement. (*See* '244 Patent at

9 col. 6:1-5; *see id.* at col. 7:3-5 ("The improvement of claim 1 wherein the front mount is

10 fixed with the *front side of the offset hoisting apparatus* and the rear mount i[s] fixed with

11 the *top side of the offset hoisting apparatus*.") (emphasis added); *id.* at cols. 7:7-10,

12 8:1-8).)  Accordingly, the court concludes that Dr. Klopp's opinion regarding the

13 improvement to the offset hoisting apparatus constitutes a new theory that was not

14 sufficiently disclosed in his Infringement Contentions.  That claim 1 is written in Jepson

15 format does not relieve Mr. Schuyleman of his obligation to "disclose what in each

16 [A]ccused [Product] [he] contends practices each and every limitation of each asserted

17 claim[.]"  *DCG Sys. v. Checkpoint Techs., LLC*, No. C 11-03792 PSG, 2012 WL

18 1309161, at *2 (N.D. Cal. Apr. 16, 2012); *see also* Local Patent Rules W.D. Wash. LPR

19 120(c) (requiring a patentee's infringement contentions to "identify[] specifically where

20 each element of each Asserted Claim is found within each Accused Device").  Having

21 reviewed Mr. Schuyleman's Infringement Contentions, the court agrees that he did not

22

1    disclose his theory that the improvement—rather than the offset hoisting apparatus—has

2    the top, bottom, front, and rear side claim limitations.

3        Because Mr. Schuyleman did not act with diligence in amending his Infringement

4    Contentions, *see supra* at 16-18, the court will not permit Mr. Schuyleman to amend his

5    Infringement Contentions to reflect that the "improvement," rather than the "offset

6    hoisting apparatus" has the claimed top, bottom, front, and rear sides.  The court therefore

7    strikes this portion of Dr. Klopp's report.

8        5.  Dr. Klopp's Alleged Identification of New Structures on the Accused Products

9        Barnhart also asserts that Dr. Klopp's report offers new infringement theories with

10    respect to each of the Accused Products.  (Klopp MTS at 11-18.)  Specifically, Barnhart

11    argues that Mr. Schuyleman "leveraged ambiguity to his advantage" by "using

12    amorphous boxes and non-specific arrows in the Infringement Contentions" and

13    subsequently identifying the infringing structures as meeting the claim limitations in Dr.

14    Klopp's report.  (*See* Klopp MTS Reply at 8.)  The court addresses each of Barnhart's

15    arguments in turn.

16        *a.  MOCCS*

17        In Barnhart's view, Dr. Klopp's report advances new infringement theories

18    regarding the "rigid boom" and "rear mount" limitations as applied to the MOCCS.  (*Id.*

19    at 11.)  Specifically, Barnhart contends that—as compared to Mr. Schuyleman's

20    Infringement Contentions, which identified the "rigid boom" with a yellow arrow—Dr.

21    Klopp's report identifies both the side beam *and* rear beam as the "rigid boom."  (*Id.* at

22    12 (referring to the highlighted structure in Dr. Klopp's report).)  Barnhart avers that the

1    rear beam, however, is an "entirely different component" from the side beam that was "in

2    no way subsumed by [Mr. Schuyleman's] prior identification of the 'rigid boom'" in the

3    Infringement Contentions.  (Klopp MTS at 12.)  Mr. Schuyleman responds that this

4    portion of Dr. Klopp's report differs from the Infringement Contentions only because he

5    highlighted—rather than used an arrow—to identify the rigid boom in his report.  (Klopp

6    MTS Resp. at 6.)  Mr. Schuyleman asserts that Dr. Klopp's report therefore does not

7    advance a new theory of infringement.  (*See id*.)

8         The court finds that Dr. Klopp's report does not set forth a new theory of

9    infringement with respect to the identification of the rigid boom or the rear beam.

10   Although the court agrees with Barnhart that the highlighted structures in Dr. Klopp's

11   report identify additional or different components than what were identified by the arrow

12   and box in the Infringement Contentions, these changes are minor and do not alter Mr.

13   Schuyleman's underlying argument that the MOCCS has a rigid boom and a rear mount.

14   *See Pavo Solutions LLC v. Kingston Tech. Co., Inc.*, No. 8:14-cv-01352-JLS-KES, 2019

15   WL 8138163, at *9-*10 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022)

16   (declining to strike expert's report where the expert changed the position of arrows so

17   that they "point to . . . different structures").

18        Barnhart advances similar arguments with respect to Dr. Klopp's identification of

19   the "rear mount"—namely, that the Infringement Contentions identified the "rear mount"

20   on the MOCCS with a yellow box, whereas Dr. Klopp's report identifies the "rear

21   mount" as a structure that would appear outside of the yellow box identified in the

22

1   Infringement Contentions.[16]  (Klopp MTS at 12-13.)  Mr. Schuyleman responds that a

2   review of the correct images in the Infringement Contentions reveals that Dr. Klopp's

3   report identifies the same structure as the "rear mount."  (Klopp MTS Resp. at 6-7.)

4          Having reviewed the Infringement Contentions and the corresponding portions of

5   Dr. Klopp's report, the court concludes that Dr. Klopp's identification of the "rear

6   mount" does not substantially depart from the Infringement Contentions so as to have

7   deprived Barnhart of notice of what structure allegedly meets the "rear mount" limitation.

8   *See Pavo Solutions*, 2019 WL 8138163, at *9-*10.  Moreover, Barnhart has not pointed

9   to any authority addressing the situation where the patentee failed to precisely identify

10  specific structures in its infringement contentions but does so in an expert report.  *See*

11  *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 WL 1865921, at

12  *2 (N.D. Cal. Apr. 25, 2019) (making the same observation).  On this record, the court

13  concludes that "it would be improper to strike portions of Dr. [Klopp's] report based

14  solely on the failure to disclose specific structures" in the Infringement Contentions.  *See*

15  *id.*[17]

16

17

18  _____

19      [16] Barnhart states that it mistakenly included an image depicting the "front mount" in its
    motion to strike, and provides the correct image in its reply brief.  (Klopp MTS Reply at 7 n.1.)
20  Barnhart, however, maintains its argument that the Infringement Contentions "did not fully
    disclose the 'rear mount' shown" in Dr. Klopp's report.  (*Id.*)

21      [17] In its reply, Barnhart argues that Dr. Klopp's identification of the "front mount" on the
    MOCCS also differs from the structure that was identified in the Infringement Contentions.
22  (Klopp MTS Reply at 7.)  Because Barnhart did not make this argument in its opening brief, the
    court does not consider it here.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

b. *Mini-MOCCS*

Barnhart also avers that Dr. Klopp's report advances new theories of infringement regarding the "front mount" and "rear mount" limitations with respect to the Mini-MOCCS. (Klopp MTS at 8.) In Barnhart's view, Mr. Schuyleman's Infringement Contentions identify these structures on the Mini-MOCCS with yellow boxes "as portions of an external, rectangular casing (outer tube)[.]" (*Id.*)

Mr. Schuyleman responds that Dr. Klopp has not identified new structures but has "simply provided clearer indications of where the elements are found by highlighting the relevant structures[.]" (Klopp MTS Resp. at 7.) He also asserts Dr. Klopp identifies the same structures as the "front mount" and "rear mount" in his report as they are identified in the Infringement Contentions. (*Id.* at 8.) While the Infringement Contentions are less precise than Dr. Klopp's expert report, the court concludes that the allegedly infringing components were sufficiently identified in the Infringement Contentions to put Barnhart on notice as to Mr. Schuyleman's infringement theory.

Barnhart also contends that Dr. Klopp's report opines, for the first time, that the front and rear mounts are "section[s] of rectangular tube with an opening (aperture) through which the rigid boom may travel." (Klopp MTS at 14.) Barnhart also takes issue with Dr. Klopp's inclusion of a "cross-sectional analysis of the outer tube," which Barnhart contends departs from the Infringement Contentions by "identifying an actual distinguishable area as an 'aperture' in contact with the 'rigid boom.'" (*Id.*)

The court is not persuaded by Barnhart's arguments. As Barnhart notes, the Infringement Contentions expressly assert that both the front and rear mounts (identified

1   by yellow boxes) have "aperture[s]" which "confine[] the slidable movement of the boom

2   (identified by the yellow arrow)." (*Id.* at 13 (citing Infringement Contentions, Ex. 2, at 2,

3   4).) Dr. Klopp's opinion that the front and rear mounts have "opening[s] (aperture[s])

4   through which the rigid boom may travel" and his identification of the alleged front and

5   rear booms in his report are therefore permissible applications of the theories set forth in

6   the Infringement Contentions. *Digit. Reg of Tex.*, 2014 WL 1653131, at *5 ("In patent

7   litigation, expert reports are expected to provide more information than is contained in

8   infringement contentions."). Accordingly, the court declines to exclude this portion of

9   Dr. Klopp's report.

10          *c.  Mega-MOCCS*

11          Barnhart makes similar arguments with respect to Dr. Klopp's identification of the

12   "rigid boom," "front mount" and "rear mount" limitations on the Mega-MOCCS. (*See*

13   Klopp MTS at 15-16.) In Barnhart's view, the Infringement Contentions identify the

14   rigid boom as the "innermost stage of a telescoping structure" whereas Dr. Klopp's report

15   opines that the rigid boom "encompasses both the innermost and intermediate stages."

16   (*Id.*) Barnhart also argues that Dr. Klopp's report advances new infringement theories

17   regarding the alleged "front mount" and "rear mount" limitations on the Mega-MOCCS

18   "in nearly the same manner as with the Mini-MOCCS." (Klopp MTS at 17 (emphasis

19   omitted); *see id.* at 18.) Mr. Schuyleman responds that Dr. Klopp's opinions are not new

20   infringement theories but instead expound on the theories advanced in the Infringement

21   Contentions. (*See* Klopp MTS Resp. at 9.)

22

1    The court rejects Barnhart's arguments for the same reasons that it rejected these

2    arguments with respect to the Mini-MOCCS.  Dr. Klopp's opinion that the alleged front

3    and rear mounts of the Mega-MOCCS have front and rear apertures that "engage[] with

4    the perimeter of the boom and confine[] the boom to slidable movement in a telescoping

5    manner" (Klopp Report, App'x D at 16; *see id.* at 19), are permissible applications of the

6    theories set forth in the Infringement Contentions—namely, that the alleged front and

7    rear mounts of the Mega-MOCCS have respective front and rear boom aperture which

8    "confines the slidable movement of the boom[.]"  (Infringement Contentions, Ex. 3 at 3,

9    4; *see also id.* at 5 (stating that the boom in the Mega-MOCCS may be "selectively slid

10   between a retracted and extended position").)

11   Barnhart also takes issue with Dr. Klopp's opinion that the Mega-MOCCS has

12   "two rigid booms."  (Klopp MTS at 16 (citing Klopp Report, App'x D at 14).)  The court

13   has compared the images Barnhart identified in Mr. Schuyleman's Infringement

14   Contentions and in Dr. Klopp's report and concludes that Dr. Klopp does not advance a

15   new theory of infringement.  (*See* Infringement Contentions, Ex. 3 at 2-3; Klopp Report

16   App'x D at 14 (figure 12).)  Although Dr. Klopp's report is more precise than the

17   Infringement Contentions, the components identified in the Infringement Contentions

18   provide Barnhart sufficient notice of Mr. Schuyleman's infringement theory.  The court

19   accordingly declines to strike Dr. Klopp's report on this basis.

20

21

22

ORDER - 29

1    **D.    Barnhart's Motion to Exclude Mr. Morman's Testimony[18]**

2          Mr. Schuyleman retained Mr. Morman to opine on the amount of reasonable

3    royalty damages necessary to compensate Mr. Schuyleman for Barnhart's alleged

4    infringement of the '244 Patent.  (Morman Report (Dkt. # 91-2) at 4.)  Below, the court

5    provides relevant background applicable to the calculation of reasonable royalty

6    damages, and then examines Mr. Morman's opinions.

7          1.   Reasonable Royalty Damages

8          Upon a finding of infringement, the patentee is entitled to "damages adequate to

9    compensate for the infringement, but in no event less than a reasonable royalty for the use

10   made of the invention by the infringer."  35 U.S.C. § 284.  A reasonable royalty amount

11   is typically determined using the hypothetical negotiation approach, which "attempts to

12   ascertain the royalty upon which the parties would have agreed had they successfully

13   negotiated an agreement just before infringement began."  *Lucent Techs., Inc. v.*

14   *Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  To determine the reasonable

15   royalty that would have been agreed to in a hypothetical negotiation, experts often

16   consider one or more of a non-exhaustive list of fifteen factors set forth in *Georgia-*

17   *Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  *See*

18   *also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)

19   (approving the use of the *Georgia-Pacific* factors to determine reasonable royalties).

20

21        _____

     [18] As fully explained in the court's summary judgment order, the court grants summary
     judgment in favor of Barnhart on its invalidity counterclaim.  The parties' arguments regarding
     Barnhart's motion to exclude Mr. Morman's testimony do not undermine the court's conclusion

22   that Barnhart is entitled to summary judgment on its invalidity counterclaim.

1        A reasonable royalty can take the form of a running royalty paid over time, or a

2  lump sum amount paid at one time.  When an expert believes that a hypothetical

3  negotiation would have yielded a running royalty paid by the alleged infringer to the

4  patentee, "the classic way to determine the reasonable royalty is to multiple the royalty

5  base, which represents the revenue generated by the infringement, by the royalty rate,

6  which represents the percentage of revenue owed to the patentee." *WhitServe, LLC,* 694

7  F.3d at 27.  When the patented components do not make up the whole of the accused

8  products, and the patented feature does not drive the demand for the entire product, "the

9  ultimate combination of royalty base and royalty rate must reflect the value attributable to

10  the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*,

11  773 F.3d 1201, 1226 (Fed. Cir. 2014).[19]  Additionally, to avoid "skew[ing] the damages

12  horizon for the jury[,]" the patentee must choose a royalty base that is not too high, and in

13  no event higher than the smallest salable patent-practicing unit, even if offset by a low

14  royalty rate.  *Id.* at 1227 (quotations and citations omitted).

15        Under the Rule 702 analysis, "questions regarding which facts are most relevant

16  for calculating a reasonable royalty are properly left to a jury[.]"  *Virnetx, Inc. v. Cisco*

17  *Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).  "[A] critical prerequisite, [however,] is

18

19

20

---

[19] The parties agree that each of the Accused Products are "multi-component products," that each of the Accused Products have components that do not infringe the '244 Patent, and that some of the non-infringing components on each of the Accused Products drive demand in part for the Accused Products.  (Third RFA Resp. (Dkt. # 91-10), Nos. 136-47, 152-55.)

21

22

1  that the underlying methodology be sound." *Id.* When the expert's methodology is not

2  sound, exclusion of the expert's opinion is proper. *Id.*

3      2.  Mr. Morman's Damages Opinions

4      Mr. Morman's report offers a proposed reasonable royalty for the patents asserted

5  against Barnhart by Mr. Schuyleman.[20]  (*See* Morman Report at 6.)  To calculate a

6  reasonable royalty, Mr. Morman applied the *Georgia-Pacific* factors to a hypothetical

7  negotiation between Mr. Schuyleman and Barnhart.  (*See id.* at 13-36.)

8      Barnhart contends that Mr. Morman's application of the *Georgia-Pacific* factors

9  relies on "unsupported assumptions" and "ignores material facts."  (*See* Morman Mot. at

10  6; *see id.* at 8.)  Specifically, Barnhart asserts that Mr. Morman's opinions are unreliable

11  because (1) he improperly included non-infringing products in his royalty base; (2) he

12  fails to properly apportion the value of the patented components of the Accused Products;

13  (3) he improperly included convoyed sales in his analysis; (4) he fails to consider

14  evidence of licensing; and (5) he fails to consider non-infringing alternatives.  (Morman

15  Mot. at 7-17.)  The court examines each of these arguments in turn.

16      *a.  Royalty Base*

17      Barnhart contends that Mr. Morman's royalty base opinions are unreliable because

18  he inadvertently included the single beam MOCCS cantilever—a non-infringing

19

20  _____

[20] Because Mr. Schuyleman does not seek to recover lost profits, Mr. Morman performed

21  a reasonable royalty analysis.  (Morman Report at 12; *see also* 2/12/25 Order (Dkt. # 96)
(granting stipulated motion dismissing Mr. Schuyleman's claims for damages based on lost

22  profits).)

1   product—in the royalty base.  (Morman Mot. at 11-12; Morman Reply at 5-6; *see* Dep. of

2   L. Morman (Dkt. # 91-3) ("Morman Dep.") at 69:7-19.)  Mr. Schuyleman does not

3   dispute that Mr. Morman included the non-infringing product in his proposed royalty

4   base.  (*See* Morman Resp. at 3.)  He asserts, however, that Mr. Morman's royalty base

5   testimony should not be excluded because the non-infringing product was included due to

6   Barnhart's "fail[ure] to keep appropriate records to differentiate between accused and

7   non-accused products."  (Morman Resp. at 3.)

8       As a general matter, "[t]he royalty base for reasonable royalty damages cannot

9   include activities that do not constitute patent infringement, as patent damages are limited

10  to those adequate to compensate for the infringement."  *Enplas Display Device Corp. v.*

11  *Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 411 (Fed. Cir. 2018) (quotations and

12  citations omitted); *see also Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th

13  1339, 1357 (Fed. Cir. 2022) (affirming exclusion of expert's opinion when expert

14  improperly included non-infringing products in the royalty base).  Mr. Morman stated

15  that he inadvertently included the non-accused "single beam [MOCCS] cantilever" in his

16  royalty base calculation because he "did not realize that there was a distinction" between

17  the Accused Products and the single beam MOCCS cantilever.  (Morman Dep. at

18  69:7-19, 61:2-14.)  Mr. Morman states that his royalty base calculation may need "an

19  adjustment" to account for the non-accused product.  (*Id.* at 69:12-15; *see id.* at 39:4-11

20  (stating that the inclusion of the single beam hoist "may have an impact to the . . . royalty

21  base"); *id.* at 62:1-8 ("I agree an adjustment needs to be made to reflect . . . any jobs that

22  are using a non-accused product should be removed.").  It is not clear from Mr.

1    Morman's testimony, however, how much the royalty base should be adjusted after

2    excluding the non-infringing products. (*See* Morman Dep. at 69:15-19 ("At this time, I

3    don't have sufficient information to make that [royalty base] adjustment as I'm not aware

4    of which jobs that Barnhart performed services on that used . . . a single beam

5    configuration.").

6        Mr. Schuyleman asserts that any "imprecision" in Mr. Morman's report must be

7    resolved against Barnhart. (Morman Resp. at 3 (citing *Sensonics, Inc. v. Aerosonic*

8    *Corp.*, 81 F.3d 1566, 1573 (Fed. Cir. 1996)).) But Mr. Schuyleman bears the burden of

9    establishing damages. *Dow Chem. Co. v. Mee Indus., Inc.,* 341 F.3d 1370, 1381 (Fed.

10   Cir. 2003); *cf. Open Text S.A. v. Box, Inc.*, No. 13-CV-04910-JD, 2015 WL 349197, at *4

11   (N.D. Cal. Jan. 23, 2015) (excluding expert testimony where expert failed to "refine data

12   in other conventional ways"); *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687,

13   690 (E.D. Tex. 2010) (holding that plaintiff could not "shift the burden" of proving

14   damages on defendants by "complaining that [defendants] did not provide sufficient

15   information for [plaintiff's expert]" to calculate the royalty base). Mr. Schuyleman does

16   not assert that Barnhart refused to provide data to identify which services were performed

17   using non-accused products versus Accused Products. (*See generally* Morman Resp.) To

18   be sure, Barnhart's 30(b)(6) representative testified that Barnhart does not "keep track" of

19   sales involving the single beam cantilever versus the Accused Products. (*See* Dep. of R.

20   Kaercher (Dkt. # 105-1) ("Kaercher Dep.") at 137:8-12.) That representative also

21   estimated, however, that the single beam system is used approximately "20 to 30 percent

22   of the time." (*Id.* at 137:15-17.) At deposition, Mr. Morman stated that he could not

1   update his royalty base calculation using these estimated figures because he "believe[s]

2   Barnhart knows precisely which jobs were quoted using a single beam cantilever[.]"

3   (Morman Dep. at 63:21-22; *see also id.* at 62:9-16 (stating that he "believe[s] there

4   should be sufficient information that should be produced of which we can accurately

5   identify which jobs where a single beam tool was used on").  At a minimum, however,

6   Mr. Morman could have updated his royalty base calculation to reflect the estimated

7   figure provided by Barnhart's 30(b)(6) representative.  Because Mr. Morman's royalty

8   base includes non-infringing products, the court cannot conclude that his royalty base

9   opinions are premised on a reliable methodology.

10          b.  *Apportionment*

11          Barnhart also asserts that Mr. Morman's report is unreliable because he failed to

12  apportion the value of the infringing components of the Accused Products from the

13  non-infringing components of the Accused Products.  (Morman Mot. at 8-11.)  Mr.

14  Schuyleman disagrees.  (Morman Resp. at 1.)  Specifically, he argues that Mr. Morman

15  "acknowledged the law of apportionment in his report" by "devis[ing] an appropriate

16  mechanism" that accounts for the parties' respective contributions to the Accused

17  Products.  (*See* Morman Resp. at 1.)

18          Calculating reasonable royalty damages "is no small challenge where one

19  component [of the accused product] 'may be covered by an asserted patent, while other

20  components are not.'"  *Golden Bridge Tech. v. Apple Inc.*, No. 5:12-cv-04882-PSG, 2014

21  WL 2194501, at *5 (N.D. Cal. May 18, 2014) (quoting *LaserDynamics, Inc. v. Quanta

22  Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012)).  In circumstances where the infringing

1    technology does not constitute the whole of the Accused Product, apportionment is

2    required.  *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879

3    F.3d 1332, 1348 (Fed. Cir. 2018).  Apportionment can be addressed in a variety of ways,

4    including "by careful selection of the royalty base to reflect the value added by the

5    patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of

6    the product's non-patented features; or by a combination thereof." *Ericsson*, 773 F.3d at

7    1226; *see also Commonwealth Scientific and Indus. Research Org. v. CISCO Sys. Inc.*,

8    809 F.3d 1295, 1301 (Fed. Cir. 2015) ("[U]nder th[e] apportionment principle, 'there

9    may be more than one reliable method for estimating a reasonable royalty.'" (citation

10    omitted)).  "The essential requirement is that the ultimate reasonable royalty award must

11    be based on the incremental value that the patented invention adds to the end product."

12    *Ericsson*, 773 F.3d at 1226.  Here, because Mr. Morman did not apportion the value of

13    the infringing and non-infringing components in the royalty base (*see* Morman Dep. at

14    69:7-19; Morman Resp. at 3), he was required to account for apportionment in his royalty

15    rate calculation.

16        Mr. Morman assesses the royalty rate as "[$]4,000 per unit[.]"[21]  He states that the

17    $4,000 figure is based "only on the economic value of the patented technology[.]"  (*See*

18    Morman Report at 30.)  Mr. Morman derives this figure from various documents

19    produced by Barnhart reflecting a range of "internal charge[s] (before [a] 50% markup)"

20    _____

21        [21] The court observes that in various points in his report, Mr. Morman defines the
      proposed royalty rate as "$4,000 per use[,]" $4,000 per unit[,]" and "$4,000 per day as a starting
      point for [his] basis of a per-unit royalty."  (Morman Report at 33, 35, 32.)  It is therefore unclear

22    which basis of measurement he relies on in forming his reasonable royalty opinions.

1    for use of the Accused Products. (*Id.* at 32 n.102.) Mr. Morman selected $4,000 as the

2    base price, "[t]o be conservative," because he believed that amount "was more of the

3    lower end of th[e] range" of internal charges. (Morman Dep. at 128:2-22.)[22] Mr.

4    Morman asserts that "Barnhart's contributions" to the Accused Products—i.e., the non-

5    infringing components—are reflected in the 50% markup and are not included in the

6    $4,000 base price. (*Id.* at 144:2-15; Morman Report at 32.) He further asserts his

7    methodology serves as an effective substitute for apportionment because it "capture[s]

8    the expectation that Mr. Schuyleman would expect to receive" from Barnhart's use of the

9    Accused Products and "account[s] for an economic consideration in return for Barnhart's

10   contributions" to the Accused Products. (Morman Dep. at 147:15-148:11.)

11        The court agrees with Barnhart that Mr. Morman's analysis does not adequately

12   apportion between the infringing and non-infringing components of the Accused

13   Products. Mr. Morman asserts that his approach accounts for the non-infringing

14   components because Barnhart "earn[s] a significant return on their contributions" to the

15   Accused Products "by way of the markups[.]" (*See id.* at 145:16-146:9; *see also id.* at

16   144:4-6 (stating that "[t]he factors that would be unrelated to the patented technology

17   would be reflective in the markups").) From this, Mr. Morman opines that "as long as

18

19

20        [22] Mr. Morman also contends that $4,000 is "typically an internal type of charge for
     similar equipment" in the industry. (Morman Dep. at 128:1-129:14.) But courts have rejected an
     expert's deriving of a royalty rate by choosing a starting point based on industry-wide data as an
21   alternative to the specific facts of the case. *See VirnetX*, 767 F.3d at 1331-34; *Dynetix Design
     Solutions, Inc. v. Synopsys, Inc.*, No. C 11-05973 PSG, 2013 WL 4538210, at *4-*5 (N.D. Cal.
22   Aug. 22, 2013). Accordingly, the industry standards cannot alone support Mr. Morman's
     proposed royalty rate.

1    [Barnhart] [is] earning a return on their investment that should cover . . . their

2    contributions to" the Accused Products.  (*Id.* at 147:4-7.)  But Mr. Morman never

3    explains how he knows that all of Barnhart's contributions to the Accused Products are

4    reflected in the markups and that the markups do not include infringing components.

5    Indeed, the Barnhart documents that Mr. Morman relies on merely provide that Barnhart

6    charges a premium for use of its cantilever equipment—and that Barnhart expects to earn

7    a gross profit margin plus markup on the use of its equipment.  (*See* Morman Report at

8    31-32; *id.* n.101; *id.* at 24.)  While "estimating a reasonable royalty is not an exact

9    science[,] . . . the data utilized in the methodology [must be] sufficiently tied to the facts

10   of the case."  *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir.

11   2015).

12          Mr. Schuyleman likens Mr. Morman's methodology to that of the expert in

13   *Carucel Investments, L.P. v. Novatel Wireless, Inc.*, No. 16-cv-118-H-KSC, 2017 WL

14   1215838 (S.D. Cal. Apr. 3, 2017).  (Morman Resp. at 2.)  In that case, the plaintiff

15   challenged the defendant's damages expert's apportionment methodology as unreliable.

16   *See Carucel*, 2017 WL 1215838 at *3-*4.  As relevant here, that expert applied a "price-

17   based apportionment" method in which he reduced the proposed royalty base by

18   comparing the price of later models of the alleged infringing products to the original

19   value of non-infringing components.  *Id.*  Specifically, the expert's apportionment

20   method was "based on the ratio of the first accused [] device . . . divided by the observed

21   average sales price over time."  *Id.* at *6.  The expert explained that this method

22   "allow[ed] for removal of non-infringing functionality that has been added to the

1    products over time, which improve the products['] value but do not relate to the patents-

2    in-suit." *Id.* The *Carucel* court concluded that the expert provided a "reasonable

3    explanation" for his apportionment and declined to exclude his testimony. *Id.* Here, in

4    contrast, Mr. Morman does not provide any explanation for *how* his apportionment

5    analysis removes the non-infringing components of the Accused Products. (*See generally*

6    Morman Report; *see* Morman Dep. at 129:15-19 (stating that he did not perform

7    additional analysis or calculation "[b]eyond what is stated in [his] report" to arrive at the

8    $4,000 royalty rate).) Accordingly, Mr. Morman's report and testimony must be

9    excluded. *See MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1375 (Fed.

10   Cir. 2021) (excluding damages expert's opinion for failure to apportion).

11         The court reiterates that, to be admissible, an expert's testimony must be the

12   product of reliable principles and methods applied to sufficient facts or data. Fed. R.

13   Evid. 702(d). To this end, district courts, as gatekeepers, must ensure that all expert

14   testimony is rooted in firm scientific or technical ground. *Daubert*, 509 U.S. at 589-90;

15   *Kumho*, 526 U.S. at 148. A "critical prerequisite" to the admission of a damages expert's

16   reasonable royalty "is that the underlying  methodology must be sound." *Virnetx*, 767

17   F.3d at 1329. A patent damages expert's failure to apportion the royalty base and the

18   royalty rate renders his reasonable royalty analysis unreliable. *See MLC Intell. Prop.,*

19   *LLC v. Micron Tech., Inc.*, No. 14-CV-03657-SI, 2019 WL 3070567, at *4 (N.D. Cal.

20   July 12, 2019), *aff'd*, 10 F.4th 1358 (Fed. Cir. 2021); *see also Virnetx*, 767 F.3d at 1329

21   (excluding royalty base testimony as inadmissible for failure to apportion). Because the

22   court concludes that Mr. Morman's reasonable royalty analysis is fundamentally flawed

ORDER - 39

1  both as to the royalty base and the royalty rate, the court need not address Barnhart's

2  challenges to Mr. Morman's opinions regarding convoyed sales, licensing, and non-

3  infringing alternatives.  *See MLC Intell. Prop.*, 2019 WL 3070567 at *4 (excluding

4  entirety of patent damages expert's opinion as unreliable for failure to apportion the

5  royalty rate and the royalty base).

6  **E.     Mr. Schuyleman's Motion to Exclude Mr. Perkin's Testimony**

7        Barnhart retained Mr. Perkin to opine on the issues of invalidity and non-

8  infringement.  (Perkin Op. Report (Dkt. # 93-2) at 5; Perkin Reb. Report (Dkt. # 93-3) at

9  5.)  Mr. Schuyleman asserts that Mr. Perkin's testimony should be excluded because he

10  (i) improperly construes claim terms; (ii) fails to specify whether the claims at issue are

11  apparatus or method claims; (iii) fails to distinguish between anticipation and

12  obviousness in his discussion of prior art; (iv) fails to advance consistent written

13  description and enablement arguments with respect to certain claim terms; and (v) fails to

14  support certain indefiniteness opinions.  (*See* Perkin Mot. at 4-12.)  The court addresses

15  these arguments below.

16     1.  Alleged Improper Claim Construction

17        Mr. Schuyleman contends that Mr. Perkin improperly construes both terms that

18  were not construed by the court and terms that the court already construed in its claim

19  construction order.  (Perkin Mot. at 4.)  Barnhart responds that Mr. Perkin applied the

20  plain and ordinary meaning of non-construed terms, and uses the court's claim

21  constructions to apply the construed terms.  (Perkin Resp. at 6.)  The court examines the

22  parties' respective arguments in turn.

1                    a.  *Alleged Improper Claim Construction of Non-Construed Terms*

2          Mr. Schuyleman contends that Mr. Perkin improperly construed the terms "hook

3  means" and "clamping means[,]" neither of which were identified by the parties as

4  disputed claim terms or construed by the court in its claim construction order.  (Perkin

5  Mot. at 5-6; *see generally* CC Order.)  In response, Barnhart asserts that the term

6  "means" in "hook means" and "clamping means" triggers the rebuttable presumption that

7  those claim limitations are means-plus-function limitations and that Mr. Perkin properly

8  applied the presumption.  (*See* Perkin Resp. at 11.)  Barnhart further asserts that Mr.

9  Schuyleman has not demonstrated that Mr. Perkin's application of the rebuttable

10  presumption renders his testimony unreliable or irrelevant.  (*Id.*)

11          The construction of claims is within the province of the court.  *Markman v.*

12  *Westview Instruments, Inc.,* 517 U.S. 370, 387 (1996).  Parties may introduce evidence as

13  to the *plain and ordinary* meaning of non-construed terms at trial "as long as the

14  evidence does not amount to arguing claim construction to the jury." *Icon-IP Pty Ltd.*, 87

15  F. Supp. 3d at 945.  That is because "the risk of confusing the jury is high when experts

16  opine on claim construction." *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319,

17  1337 (Fed. Cir. 2009).  Accordingly, expert testimony that includes improper claim

18  construction arguments must be excluded.  *Icon-IP Pty Ltd.*, 87 F. Supp. 3d at 945; *see*

19  *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (affirming district

20  court's exclusion of expert's claim construction arguments before the jury).  The court

21  assesses Mr. Perkin's opinions regarding the terms "hook means" and "clamping means"

22  with these principles in mind.

As to the term "hook means[,]" Mr. Perkin opines:

Claim 1 includes the term "hook means", which I understand is a means plus function limitation that invokes 35 U.S.C. § 112 ¶ 6. Accordingly, I have interpreted claim 1 to cover structure, materials, or acts in the specification, and equivalents thereof, which correspond to the term "hook means".

(Perkin Op. Report ¶ 83; Perkin Reb. Report ¶ 90.)  Mr. Schuyleman asserts that this constitutes an "improper constru[ction]" of the term "hook means" that "usurps" the role of the court.  (Perkin Mot. at 5; *see* Perkin Reply at 1-2.)  Barnhart contends that Mr. Perkin's "hook means" opinions are merely an application of the rebuttable presumption. (*See* Perkin Resp. at 11-12.)  The court agrees with Mr. Schuyleman that Mr. Perkin's "hook means" testimony constitutes improper claim construction.  "The task of determining whether [a] limitation in question should be regarded as a means-plus-function limitation" is a claim construction issue within the province of the court. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000) ("Whether the language of a claim is to be interpreted according to 35 U.S.C. § 112, ¶ 6, i.e., whether a claim limitation is in means-plus-function format, is a matter of claim construction.").  Mr. Perkin admits that he used his own construction of "hook means" in connection with his opinions regarding infringement, obviousness, and anticipation.  (Perkin Mot., Ex. D ("Perkin Dep.") at 160:3-6, 115:15-24, 114:8-18, 119:14-120:10, 122:5-23, 124:10-125:8.)  Accordingly, the court concludes that the challenged portions of Mr. Perkin's

1    testimony that include these improper claim constructions must be excluded.[23]  *See Icon*,

2    87 F. Supp. at 945.

3         As to the term "clamping means[,]" Mr. Perkin opines:

4         Claims 12 and 13 each include the term "clamping means", which I
          understand is a means plus function limitation that invokes 35 U.S.C. § 112

5         ¶ 6. Accordingly, I have interpreted claims 12 and 13 to cover structure,
          materials, or acts in the specification, and equivalents thereof, which

6         correspond to the term "clamping means". My opinion is that only one such
          "clamping means" is disclosed: at least one bolt and a nut . . . Accordingly, I

7         have interpreted the term "clamping means" in claims 12 and 13 to refer to
          "at least one bolt and nut", and only to "at least one bolt and nut".

8    (Perkin Op. Report ¶¶ 84-85; Perkin Reb. Report ¶¶ 91-92.)  Mr. Perkin also used his

9    construction of this term in developing his opinions on non-infringement, and for his

10   opinions of certain prior art references.  (*See* Perkin Dep. at 160:7-11, 115:25-116:5,

11   117:3-8, 120:6-10, 121:9-14, 122:24-123:5, 124:3-9, 125:10-16, 126:19-127:1.)  Barnhart

12   does not dispute that Mr. Perkin used his own construction of "clamping means," but

13   asserts that the term need not be construed because Mr. Schuyleman no longer asserts

14   claims 12 and 13.  (Perkin Resp. at 11.)  He also argues that Mr. Perkin's "clamping

15   means" opinions should not be excluded because his opinions merely apply the rebuttable

16   presumption that "clamping means" is a means-plus-function limitation.  (*See id.* at n.1.)

17   Because the question of whether a claim limitation is in means-plus-function format is a

18   matter of claim construction, however, the court concludes that the portions of Mr.

19

20

21   [23] Barnhart argues Mr. Perkin's interpretation did not ultimately impact his assessment of
     whether the prior art included a "hook means." (Perkin Resp. at 11-12.)  Because the court
     cannot determine how Mr. Perkin's use of his construction impacted his analysis, this portion of
22   his opinion must be excluded.

1   Perkin's testimony that include these improper claim constructions must be excluded.

2   *See Icon*, 87 F. Supp. at 945.

3        Barnhart contends that the terms "hook means" and "clamping means" may still be

4   construed by the court at this stage.  (*See* Perkin Resp. at 10-11 (citing cases).)  It is true

5   that the court "retains discretion to hear belated claim construction arguments" after the

6   *Markman* hearing.  *Stern v. SeQual Techs., Inc.*, 840 F. Supp. 2d 1260, 1266 (W.D.

7   Wash. 2012), *aff'd*, 493 F. App'x 99 (Fed. Cir. 2012).  The Federal Circuit, however, has

8   upheld a district court's decision not to entertain untimely claim construction arguments

9   made after the relevant disclosure deadlines under the applicable local patent rules.  *See*

10  *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005)

11  (considering the Northern District of California's local patent rules).  This District's

12  Local Patent Rules require the disclosure of all terms governed by 35 U.S.C. § 112 ¶ 6

13  "within 20 days of service of the contentions."  Local Patent Rules W.D. Wash. LPR

14  130(a).  Barnhart did not raise these terms for construction in its contentions or in

15  connection with the *Markman* hearing, nor does it make any argument as to why the court

16  should construe them now.  (*See generally* Perkin Resp. at 10-11.)  Barnhart had ample

17  opportunity to seek construction of the "hook means" and "clamping means" terms.  *See*

18  *Battcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 640-41 (Fed. Cir. 2011) (affirming

19  district court's holding that "[defendant] could not add new claim construction theories

20  on the eve of trial" when defendant failed to seek construction earlier).  Accordingly, the

21  court declines to construe these terms at this stage of the litigation.  *See SanDisk*, 415

22  F.3d at 1292 ("[T]his court gives broad deference to the trial court's application of local

ORDER - 44

1    procedural rules in view of the trial court's need to control the parties and flow of

2    litigation before it.") (citation omitted).

3                    *b.  Alleged Relitigation of Construed Claims*

4           Mr. Schuyleman argues that Mr. Perkin attempts to relitigate certain claim

5    constructions or interprets claim terms inconsistently with the court's constructions.

6    (Perkin Mot. at 6-7; Perkin Reply at 2-3.)  Barnhart asserts that Mr. Perkin's proposed

7    interpretations are consistent with the court's claim constructions.  (Perkin Resp. at 6-7.)

8    The court first discusses the relevant legal background, and then examines the parties'

9    arguments.

10                     *i.  Relevant Legal Background*

11          A court's claim construction is the "law of the case" for purposes of trial.

12   *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1371 n.2 (Fed. Cir. 2007); *see*

13   *also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009)

14   ("Once a district court has construed the relevant claim terms, and unless altered by the

15   district court, then that legal determination governs for purposes of trial.").  Thus, "[a]ny

16   expert testimony must adhere to the court's claim constructions and must not apply

17   alternative claim constructions."  *Dynetix Design*, 2013 WL 4537838, at *4.  An expert

18   may, however, "offer an opinion on how a court's claim construction should be applied to

19   the facts of the case."  *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1027

20   (S.D. Cal. 2023); *see also Asetek Danmark A/S v. CoolIT Sys. Inc.*, No. 19-CV-00410-

21   EMC, 2022 WL 21306657, at *8 (N.D. Cal. Oct. 4, 2022) (noting that"[t]he implications

22

1    of the Court's constructions are matters on which the parties' experts may opine")

2    (citation omitted)).

3              ii.    *"Largely Inflexible"*

4              Mr. Schuyleman asserts that Mr. Perkin attempts to relitigate the phrase "largely

5    inflexible" in his report.  (Perkin Mot. at 6-7; Perkin Reply at 2-3.)  During the claim

6    construction phase, Mr. Perkin opined that the claim term "rigid boom" should be

7    construed to mean "a uniform, linear support arm having a fixed length."  (Perkin CC

8    Decl. (Dkt. # 61-4) at 19; *see also* Barnhart CC Op. (Dkt. # 63) at 11 (advancing Mr.

9    Perkin's proposed construction).)  The court ultimately rejected the proposed "fixed

10   length" limitation and instead construed the term "rigid boom" to mean "a beam that is

11   largely inflexible."  (CC Order at 6-7; *see also id.* at 5 ("The court agrees with Mr.

12   Schuyleman that the term [rigid boom] does not require 'having a fixed length' and

13   adopts the following construction:  'a beam that is largely inflexible'").)  In Mr. Perkin's

14   expert reports, he interprets the phrase "largely inflexible" as follows:

15            I am interpreting this term to mean either inflexible in percentage or
          inflexible in degree. Specifically, I have interpreted this term, as applied to
16        the claim term "rigid boom" to mean, on one hand, that the entirety of the
          rigid boom is mostly inflexible, and on the other hand, to mean that the
17        majority of the volume ***(or length)*** of the rigid boom is inflexible.

18   (Perkin Op. Report ¶ 78; Perkin Reb. Report ¶ 85 (emphasis added by Mr. Schuyleman).)

19   According to Mr. Schuyleman, Mr. Perkin's interpretation of "largely inflexible" is an

20   attempt to relitigate his proposed "fixed length" construction.  (Perkin Mot. at 6-7.)

21   Barnhart contends that Mr. Perkin's expert reports do not opine on the length of the

22   boom, or whether it is fixed or variable.  (Perkin Resp. at 7.)  The court agrees with

1    Barnhart.  In his opening report, Mr. Perkin explicitly states that "the definition of 'rigid

2    boom' *does not impose any limitations on the boom with respect to length or variability*."

3    (Perkin Op. Report ¶ 379 (emphasis added).)  The court does not understand Mr. Perkin

4    to attempt to relitigate the proposed "fixed length" construction.[24]  Accordingly, the court

5    declines to exclude this portion of Mr. Perkin's testimony.

6                    iii.    *"Front Mount" and "Rear Mount"*

7            Mr. Schuyleman also asserts that Mr. Perkin attempts to relitigate the court's

8    constructions of the terms "front mount" and "rear mount."  (Perkin Mot. at 7; Perkin

9    Reply at 3.)  During the claim construction phase, Barnhart proposed that these terms be

10   construed as "'a support structure disposed between the center of gravity and the distal

11   end of the rigid boom' / 'a support structure disposed between the center of gravity and

12   the proximal end of the rigid boom.'"  (Barnhart CC Op. at 12-13.)  The court rejected

13   Barnhart's proposed construction, and instead construed "front mount" as "the mount

14   closest to the distal end of the rigid boom" and "rear mount" as "the mount closest to the

15   proximal end of the rigid boom."  (CC Order at 7.)  In his report, Mr. Perkin interprets the

16   term "mount" to mean "any structure which supports, or provides upward force on, a

17   suspended beam or 'rigid boom[.]'"  (Perkin Op. Report ¶ 81; Perkin Reb. Report ¶ 88.)

18   In Mr. Schuyleman's view, Mr. Perkin's interpretation of "mount" attempts to

19

20          [24] Mr. Schuyleman contends that Mr. Perkin's opinions regarding the term "largely
     inflexible" should be excluded because Mr. Perkin testified at deposition that his interpretation of
21   "largely inflexible" in his report does not differ from his proposed "fixed length" construction.
     (Perkin Mot. at 7 (citing Perkin Dep. 36:24-38:15).)  Because Mr. Perkin's report specifies that
22   the term "rigid boom" "does not impose any limitations on the boom with respect to length or
     variability[,]" the court declines to exclude his opinion on this basis.

1    "resurrect[] Barnhart's proposed construction" of the terms as "support structure[s]."

2    (Perkin Mot. at 7.)  Barnhart responds that the court rejected Barnhart's proposed "center

3    of gravity" limitation, but not its "support structure" limitation in its claim construction

4    order, and that Mr. Perkin's testimony is "entirely consistent" with the court's

5    construction because it does not reference the "center of gravity" limitation.  (*See* Perkin

6    Resp. at 8-9; CC Order at 7 ("The court agrees . . . that Barnhart's proposed '*center of*

7    *gravity*' limitation is inappropriate.") (emphasis added).)

8           The court agrees with Mr. Schuyleman that Mr. Perkin's interpretation exceeds the

9    bounds of the court's claim construction.  In its claim construction order, the court settled

10   the parties' disputes regarding the "front mount" and "rear mount" by adopting the plain

11   and ordinary meaning of those terms and notably did not adopt Barnhart's proposed

12   "support structure" limitation.  (*See* CC Order at 7.)  The court therefore concludes that

13   Mr. Perkin's opinions interpreting "front mount" and "rear mount" as "structure[s] which

14   support[], or provide[] upward force" to a rigid boom must be excluded.

15          Mr. Schuyleman also contends that Mr. Perkin's opinions regarding the terms

16   "front mount" and "rear mount" are inconsistent with the court's construction because he

17   interprets the phrases "the mount closest to the proximal[/distal] end of the rigid boom"

18   to include the limitation "during each stage of the operation."  (Perkin Mot. at 8 (citing

19   Perkin Op. Report ¶ 79; Perkin Reb. Report ¶ 86).)  For the reasons discussed below, the

20   court reserves ruling on this argument.

21          Here, Barnhart notes that the '244 Patent "claims a rigid boom with distal and

22   proximate ends, which slidably moves from a 'retracted position' to an 'extended

1    position' through apertures in the 'front mount' and 'rear mount.'" (Perkin Resp. at 9

2    (citing '244 Patent at 6:2-23).) Barnhart asserts that Mr. Perkin applied the court's

3    construction of "front mount" and "rear mount" in his reports and "considered whether

4    movement of the distal and proximal ends of the rigid boom through the mounts would

5    alter whether a given device falls within the [c]ourt's construction." (*Id.*) Barnhart

6    further asserts that Mr. Perkin used the phrase "during each stage of the operation" "to

7    describe his understanding that the [c]ourt provided *no* limitation on [the] relative

8    location of the 'front mount' and 'rear mount' during operation." (*Id.* (emphasis in

9    original).)

10        The court agrees with Mr. Schuyleman that the opinions Mr. Perkin offers at trial

11    must adhere to the court's claim constructions. To the extent that Mr. Schuyleman

12    simply disagrees with Mr. Perkin's application of the court's construction to the facts of

13    this case, however, that is not a proper basis for exclusion of his testimony. *See Pelican*,

14    655 F. Supp. 3d at 1027; *see also Elosu*, 26 F.4th at 1024 ("Ultimately, 'the test under

15    *Daubert* is not the correctness of the expert's conclusions but the soundness of his

16    methodology.'"). The court concludes that Mr. Schuyleman's concerns would be more

17    appropriately addressed through a contemporaneous objection at trial rather than

18    preclusion of Mr. Perkin's testimony on this point. *See Carucel*, 2017 WL 1215838, at

19    *17.

20            iv.    *"Forward and Backward Movement"*

21        Mr. Schuyleman also argues that Mr. Perkin's opinions regarding the phrase

22    "forward and backward movement" should be excluded as inconsistent with the court's

1    claim construction order.  (Perkin Mot. at 8.)  As relevant here, the court construed the

2    term "confining the boom" to mean "restricting the boom to forward and backward

3    movement."  (CC Order at 10.)  The court did not construe "forward and backward

4    movement" in its claim construction order.  (*See id.*)  In his reports, Mr. Perkin interprets

5    "forward and backward movement" to mean "that both the 'front boom aperture' and

6    'rear boom aperture' restrict the boom to only be movable in a forward or backward

7    direction as measured along the primary axis of the boom—i.e., along the longitudinal or

8    axial length of the boom."  (Perkin Op. Report ¶ 80; Perkin Reb. Report ¶ 87.)  In

9    response, Barnhart asserts that Mr. Perkin applied the court's construction of "forward

10   and backward movement" and "explains how a POSITA would orient such movement

11   relative to the 'rigid boom[.]'"  (Perkin Resp. at 10.)[25]  Mr. Schuyleman does not respond

12   to this argument in his reply.  (*See generally* Reply.)  "Where parties do not seek

13   construction of a term, the words are given their ordinary and customary meaning:  'the

14   meaning that the term would have to a person of ordinary skill in the art in question at the

15   time of the invention.'"  *Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-CV-04738-

16   WHO, 2020 WL 5106845, at *4 (N.D. Cal. Aug. 31, 2020).  In these circumstances,

17   experts may "present evidence about how a POSITA would understand a term," so long

18   as such opinions do not make claim construction arguments to a jury.  *Id.*  The court does

19

20        [25] Mr. Perkin states that he "made this judgment call out of necessity for [his] analysis of
     the Asserted Claims against the prior art" because "a POSITA would not necessarily be able to
21   discern with certainty the meaning . . . 'forward and backward movement' [as it is] not defined
     relative to the 'front mount' or the 'rear mount,' [or] with respect to a longitudinal, or
22   lengthwise, axis of the 'rigid boom.'"  (Perkin Op. Report ¶ 382.)

1    not understand Mr. Perkin's interpretation to amount to claim construction.  Accordingly,

2    the court declines to exclude this portion of his report.

3        2.  Apparatus or Method Claims

4        Mr. Schuyleman also challenges Mr. Perkin's opinions on the basis that his reports

5    do not "state[] whether the claims at issue in this case are method claims or apparatus

6    claims."[26]  (Perkin Mot. at 8.)  When asked at deposition whether claim 1 of the Asserted

7    Patent was an apparatus claim, Mr. Perkin responded that he had "not heard of an

8    apparatus claim, but [the claim] does have to do with an apparatus."  (Perkin Dep. at

9    161:23-162:8.)  Mr. Schuyleman contends that Mr. Perkin's "[in]ab[ility] to identify what

10   kind of claims are at issue in this case" renders his opinions unreliable because the tests

11   for infringement are distinct for apparatus and method claims.  (Perkin Mot. at 9 (citing

12   cases).)  Barnhart counters that Mr. Perkin properly analyzed the claims as apparatus

13   claims.  (Perkin Resp. at 14.)  Barnhart further contends that Mr. Schuyleman's

14   challenges are based on Mr. Perkin's patent law knowledge, rather than his area of

15   expertise, and are therefore improper.  (*Id.*)  In reply, Mr. Schuyleman responds that "[i]f

16   Mr. Perkin had anal[]yzed the claims as Apparatus claims, certainly he could have said

17   so."  (Perkin Reply at 6.)

18        Mr. Perkin's area of expertise is in mechanical engineering.  (*See* Perkin Report at

19   6.)  Barnhart retained Mr. Perkin to provide opinions regarding invalidity and non-

20   infringement.  (*See generally* Perkin Op. Report; Perkin Reb. Report.)  Mr. Schuyleman

21   _____

22   [26] The parties agree that the claim at issue is an apparatus claim.  (Perkin Mot. at 8 n.4; Perkin Resp. at 14.)

1   does not challenge Mr. Perkin's knowledge or skill as they relate to his field of expertise.

2   (*See generally* Perkin Mot.; Perkin Reply.)  And Mr. Schuyleman's challenges regarding

3   Mr. Perkin's patent law knowledge do not undermine his testimony because Mr. Perkin

4   was not retained as a patent law expert.  (*See* Perkin Op. Report ¶ 27 ("I have not been

5   asked to offer opinions on the law"); *see also WNS Holdings, LLC v. United Parcel Serv.,*

6   *Inc.*, No. 08-CV-275-BBC, 2009 WL 2136961, at *4 (W.D. Wis. July 14, 2009), *aff'd*,

7   368 F. App'x 144 (Fed. Cir. 2010) (denying motion to exclude avionics expert's non-

8   infringement and invalidity opinions despite plaintiff's challenges to his "lack of

9   expertise in patent law"); *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, No. 17-CV-

10  5096 (WMW/BRT), 2020 WL 5512507, at *5 (D. Minn. Sept. 14, 2020), *aff'd*, 30 F.4th

11  1339 (Fed. Cir. 2022) (denying motion to exclude where plaintiff challenged expert's

12  ability to explain and understand the difference between direct and indirect

13  infringement").  As Barnhart points out, Mr. Perkin explained his understanding of

14  certain infringement and invalidity principles and appears to apply his understanding in

15  developing his opinions.  (Perkin Resp. at 14 (citing Perkin Op. Report ¶¶ 27-57, 97-383;

16  Perkin Reb. Report ¶¶ 29-56, 129-274).)  Mr. Perkin also opines that the '244 Patent is

17  "directed to an apparatus for use with a crane[.]"  (Perkin Op. Report ¶ 58 (internal

18  quotations and citation omitted).)  Mr. Schuyleman does not provide any examples from

19  Mr. Perkin's report demonstrating that he incorrectly analyzed the claims as method

20  claims.  (*See generally* Perkin Mot.; Perkin Reply.)  Accordingly, the court declines to

21  exclude Mr. Perkin's testimony on this basis.

22

1          3.   Anticipation and Obviousness

2          Mr. Schuyleman contends that Mr. Perkin's opinions regarding anticipation with

3   respect to the Wheeler prior art reference[27] should be excluded because he failed to

4   distinguish between the legal standards for anticipation and obviousness.  (Perkin Mot. at

5   9.)  Specifically, Mr. Schuyleman challenges the following portion of Mr. Perkin's

6   opinion:

7          Thus, in my opinion, the Asserted Claims of the '244 Patent **are anticipated
           by Wheeler under 35 U.S.C. § 102 or are rendered obvious by**:  (i) Wheeler
8          alone; and (ii) Wheeler in view of the additional art discussed below and in
           the claim charts attached to Barnhart's Contentions, under 35 U.S.C. § 103.

9   (Perkin Op. Report ¶ 200 (emphasis added).)  Mr. Schuyleman contends that Mr. Perkin's

10  opinion is "legally wrong" because he states that certain claim elements are not present in

11  the Wheeler reference, while simultaneously opining that the '244 Patent is anticipated

12  under the Wheeler reference.  (*See* Perkin Mot. at 9.)  As Mr. Schuyleman notes, "[a]

13  finding of anticipation requires clear and convincing evidence that each and every

14  element is found within a single prior art reference, arranged as claimed."  (Perkin Mot.

15  at 3) (quoting *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1368 (Fed. Cir.

16  2019) (internal quotation and citation omitted)).  Barnhart states that Mr. Perkin's

17  statement regarding anticipation with respect to the Wheeler reference was a "scrivener's

18  error[.]"  (Perkin Resp. at 15; *see id.* (characterizing this portion of Mr. Perkin's

19

20  _____

21         [27] In discussing the Wheeler prior art reference, the parties refer to U.S. Patent No.
    3,675,961.  (*See* Perkin Op. ¶ 149.)  That patent is titled "Horizontal Load Positioner" and
    describes a "horizontal load positioner to facilitate depositing a load within or removing a load
22  from an opening in a building with the aid of a hoist line[.]"  ('961 Patent at 8:70-73.)

1  testimony as a "harmless misstatement").)  Barnhart posits that this "misstatement . . . has

2  no bearing on [Mr.] Perkin's testimony" regarding obviousness.  (*Id.*)

3       The parties agree that Mr. Perkin's anticipation opinions with respect to the

4  Wheeler reference are improper.  (Perkin Mot. at 9; Perkin Resp. at 15.)  The court

5  therefore concludes Mr. Perkin's anticipation opinions regarding that prior art reference

6  must be excluded.[28]

7     4.  "Offset Hoisting Apparatus" and "Therethrough"

8       Mr. Schuyleman argues that Mr. Perkin's testimony opining that the terms "offset

9  hoisting apparatus" and "therethrough" lack written description and enablement should

10 be excluded.  (Perkin Mot. at 10-12.)  Each of these arguments is addressed below.

11       *a.  "Offset Hoisting Apparatus"*

12       Mr. Schuyleman asserts that Mr. Perkin advances two inconsistent positions

13 regarding the term "offset hoisting apparatus."  (*See id.*) Specifically, Mr. Schuyleman

14 contends that Mr. Perkin improperly opines that a POSITA would be unable to identify

15 the extent of the "offset hoisting apparatus" in the '244 Patent, but simultaneously

16 identifies the "offset hoisting apparatus" in diagrams of prior art in other parts of his

17 report.  (*Id.* at 10-11; Perkin Reply at 4-6.)  Barnhart responds that Mr. Perkin can

18 advance these alternative theories simultaneously.  (*See* Perkin Rep. at 12.)  As explained

19 more fully below, the court declines to exclude Mr. Perkin's testimony on this basis.

20

21       [28] Mr. Schuyleman does not appear to challenge Mr. Perkin's obviousness conclusions
   with respect to the Wheeler reference.  (*See generally* Perkin Mot.; Perkin Reply.)  Accordingly,
22 the court does not address that portion of Mr. Perkin's report here.

1      As set forth in § 112, a patent's specification must contain "a written description

2   of the invention, and of the manner and process of making and using it, in such full, clear,

3   concise, and exact terms as to enable any person skilled in the art to which it pertains, or

4   with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112.  In

5   his report, Mr. Perkin opines that the term "offset hoisting apparatus" lacks written

6   description and enablement, and therefore renders the Asserted Claims indefinite,

7   because the patent language

8         does not reasonably inform a POSITA whether the "offset hoisting
          apparatus" comprises one or more of the "front mount" or the "rear mount",
9         or is a separate component . . . Further, it is my opinion that if the POSITA
          were to interpret the 'offset hoisting apparatus' as comprising one or both of
10        the "front mount" and "rear mount", the POSITA would not be able to make
          or use the invention whereby the front and rear mount are "fixed with" the
11        "offset hoisting apparatus" as required by claim 1, because the "offset
          hoisting apparatus" cannot simultaneously *comprise* the "front mount" and
12        "rear mount", *and* be a separate component which is "fixed with" the "front
          mount" and "rear mount".  It is also my opinion that if the POSITA were to
13        interpret the "offset hoisting apparatus" as being separate from one or both
          of the "front mount" and "rear mount", the '244 Patent does not recite
14        sufficient structures, acts, or functions to make clear the scope and meaning
          of the term "offset hoisting apparatus", and by extension claim 1.

15
    (Perkin Op. Report ¶ 362 (emphasis in original); *id.* ¶ 372; *see also id.* ¶¶ 350-72
16
    (offering opinion regarding the various ways to interpret "offset hoisting apparatus" from
17
    the claim language).)  Mr. Schuyleman posits that Mr. Perkin's testimony is inconsistent
18
    and therefore improper.  (*See* Perkin Mot. at 10.)  In support, Mr. Schuyleman points to
19
    paragraph 82 of Mr. Perkin's opening report, which provides that "[f]or the purpose of
20
    analyzing the term with respect to the prior art, the term 'offset hoisting apparatus'
21
    constitutes an umbrella term for a suspended lifting device designed to lift a load which is
22

1    not positioned directly under the suspension point." (Perkin Mot. at 10 (citing Perkin Op.

2    Report ¶ 82).)  Mr. Schuyleman also points to Mr. Perkin's deposition testimony stating

3    that an "offset hoisting apparatus" is "a system of components that appear to be

4    unbalanced or offset so that you can accomplish some means of inserting a load into an

5    opening in a building." (*Id.* at 10 (citing Perkin Dep. 55:23-54:2); *see also id.* (citing

6    Perkin Dep. 59:10-25 (stating that an offset hoisting apparatus is the same as an offset

7    lifting device)).)  Mr. Schuyleman asserts that Mr. Perkin can therefore "identify, define

8    and describe an 'offset hoisting apparatus' in every circumstance but for that required to

9    enable and find support in the written description for the claims of the '244 Patent." (*Id.*

10   at 11.)

11       In response, Barnhart argues that Mr. Perkin can compare the claims of the '244

12   Patent to prior art even if he simultaneously argues that those terms are indefinite.

13   (Perkin Resp. at 13 (first citing *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,

14   958 F.3d 1348, 1360 (Fed. Cir. 2020) and then citing *ImmunoGen, Inc. v. Vidal*, 653 F.

15   Supp. 3d 258, 290 (E.D. Va. 2023)); *see also* Perkin Op. Report ¶ 101

16   ("[N]otwithstanding my opinion, infra Section XV, that the term 'offset hoisting

17   apparatus' is indefinite, my opinion, and that of a POSITA, is that Saether[29] discloses an

18   improvement to an offset hoisting apparatus").)  Barnhart also argues that Mr. Perkin

19   supports his conclusion that "offset hoisting apparatus" lacks written description and

20

21       [29] "Saether" refers to U.S. Patent No. 3,762,755, which describes, "[a]n apparatus for use
     in hoisting heavy loads onto floors within an erected frame of a building." (*See* Perkin Op.
22   Report ¶¶ 98-99.)

1    enablement by "identif[ying] multiple variations" of that term in the prior art.  (*Id.*)  In

2    reply, Mr. Schuyleman asserts that the case law cited by Barnhart is inapposite because it

3    involves appeals from the PTAB, which "cannot institute *inter partes* review for claims

4    for indefiniteness."  (Perkin Reply at 3-4 (quoting *Samsung Elecs. Am., Inc. v. Prisua*

5    *Eng'g Corp.*, 948 F.3d 1342, 1350 (Fed. Cir. 2020)).)  Mr. Schuyleman does not explain,

6    however, why the holding of *Samsung* bars Mr. Perkin from advancing his written

7    description, enablement, and prior art arguments together.  Indeed, Mr. Schuyleman has

8    not provided—and the court is not aware of—any case law excluding expert testimony on

9    this basis.  Accordingly, the court denies Mr. Schuyleman's motion to exclude this

10   portion of Mr. Perkin's testimony.

11         *b.    "Therethrough"*

12         Mr. Schuyleman also argues that Mr. Perkin's opinions that the term

13   "therethrough" lacks written description and enablement should be excluded.  (Perkin

14   Mot. at 11.)  Mr. Schuyleman refers to paragraph 373 of Mr. Perkin's opening report:

15        I understand that the Claim Construction Order defined the term
          "therethrough" as "allowing the rigid boom to slide through one side and out
16        the other of both the front and rear mounts". In my opinion, the specification
          of the '244 Patent does not contain a sufficient written description of the
17        invention whereby the claimed "rigid boom" can "slide through one side and
          out the other of both the front and rear mounts" such that a POSITA would
18        be able to make and use the invention as set forth in claim 1. In my opinion,
          the POSITA would be unclear as to whether the Court's definition allows for
19        the boom to enter and completely exit each of the front mount and the rear
          mount (by way of the front boom aperture and the rear boom aperture). To
20        the extent that it does, then in my opinion as a POSITA, this construction is
          not supported by the specification.

21

22

1   (Perkin Op. Report ¶ 373.)  Mr. Schuyleman asserts that Mr. Perkin's opinion is

2   "predicated on a ridiculous, contingent interpretation" of the court's claim construction

3   order, which construed "therethrough" as "allowing the rigid boom to slide through one

4   side and out the other of both the front and rear mounts."  (Perkin Mot. at 11; CC Order

5   at 11.)  Barnhart contends that Mr. Perkin's opinion should not be excluded on this basis.

6   (Perkin Resp. at 10.)  The court agrees with Barnhart.  Experts are not permitted to

7   disregard or misapply the court's claim constructions.  *See Andersen*, 474 F.3d at 1371

8   n.2; *Dynetix*, 2013 WL 4537838, at *4.  But Mr. Schuyleman has not pointed to any

9   specific testimony in Mr. Perkin's report indicating that he has ignored or deviated from

10  the court's construction.  Indeed, the court noted in its claim construction order that "[t]he

11  '244 Patent does not contemplate slidable movement merely 'inside of' the front and rear

12  mounts."  (CC Order at 11.)  Mr. Schuyleman's challenge appears to center on Mr.

13  Perkin's application of the court's construction to the Accused Products.  *See Genband*

14  *US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-33-JRG-RSP, 2016 WL 122967, at

15  *3 (E.D. Tex. Jan. 9, 2016) (citing *Spectrum Pharms., Inc. v. Sandoz Inc.*, 802 F.3d 1326,

16  1337 (Fed. Cir. 2015)).  The court accordingly declines to exclude this portion of Mr.

17  Perkin's testimony.

18      5.  Indefiniteness

19      Mr. Schuyleman argues that Mr. Perkin provides "conclusory testimony that seven

20  terms are indefinite."  (Perkin Mot. at 12 (citing Perkin Op. Report ¶¶ 375-83); *see also*

21  Perkin Reply at 7 (arguing that "the only testimony that Mr. Perkin provides to support

22  his indefiniteness claims is *ipse dixit*.").)  Mr. Schuyleman offers no analysis to support

his argument.  (*See generally* Perkin Mot.; Perkin Reply.)  Barnhart responds that Mr.

Perkin provides the basis for his indefiniteness opinions in the portions of his testimony

cited by Mr. Schuyleman.  (*See* Perkin Resp. at 15.)  The court has reviewed paragraphs

375 to 383 of Mr. Perkin's opening report and agrees with Barnhart.  The court therefore

will not exclude this portion of Mr. Perkin's testimony.

## IV.    CONCLUSION

For the foregoing reasons, the court orders as follows:

(1)  Barnhart's motion to exclude Dr. Klopp's report and testimony is DENIED

(Dkt. # 92);

(2) Barnhart's motion to strike portions of Dr. Klopp's report is GRANTED in

part and DENIED in part (Dkt. # 86);

(3) Barnhart's motion to exclude Mr. Morman's testimony is GRANTED

(Dkt. # 91); and

(4) Mr. Schuyleman's motion to exclude Mr. Perkin's testimony is GRANTED in

part and DENIED in part (Dkt. # 93).

Dated this 15th day of May, 2025.

JAMES L. ROBART
United States District Judge